**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 2, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERT L. THOMAS and AMANDA
THOMAS, individually and on behalf
of all others similarly situated,

    Plaintiffs - Appellants,

v.

METROPOLITAN LIFE INSURANCE
COMPANY and METLIFE
SECURITIES, INC.,

    Defendants - Appellees.

----------------------

AMERICAN COUNCIL OF LIFE
INSURERS,

    Amicus-Curiae.

No. 09-6207

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 07-CV-00121-F)**

---

Timothy Becker, (Carolyn G. Anderson and Brian C. Gudmundson of
Zimmerman, Reed, P.L.L.P., Minneapolis, Minnesota; Mark E. Bialick and David
B. Donchin of Durbin, Larimore & Bialick, Oklahoma City, Oklahoma; Michael
Burrage, Simone G. Fulmer, Reggie N. Whitten and Lauren F. Guhl of Whitten,
Burrage, Priest, Fulmer, Anderson & Eisel, Oklahoma City, Oklahoma; and
Venessa R. Brentwood, Oklahoma City, Oklahoma, with him on the briefs), for
Plaintiffs - Appellants.

Daniel McNeel Lane, Jr. (and Nada L. Ismail of Akin, Gump, Strauss, Hauer & Feld, L.L.P.; San Antonio, Texas; Ashley B. Vinson of Akin, Gump, Strauss, Hauer & Feld, L.L.P., San Francisco, California, on the brief), for Defendants - Appellees.

Lisa Tate of American Council of Life Insurers, Washington, D.C. and Miriam R. Nemetz and Melanie Wilson Rughani of Mayer, Brown, L.L.P., Washington, D.C, for Amicus Curiae.

---

Before **KELLY**, **EBEL**, and **GORSUCH**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Plaintiffs-Appellants Robert and Amanda Thomas appeal from the district court's grant of summary judgment in favor of Defendants-Appellees Metropolitan Life Insurance Companies, Inc. and Metlife Securities, Inc. (sometimes collectively referred to as "Met"). Plaintiffs filed a putative class action on behalf of class members who bought life insurance products from Met. Two issues are before us: (1) whether the district court abused its discretion by refusing to grant leave to amend the Second Amended Complaint ("SAC") to add named plaintiffs who had standing to assert securities fraud claims, and (2) whether the district court erred in granting summary judgment to Met on the ground that Mr. Laxton—the representative who sold a life insurance policy to Plaintiffs Robert and Amanda Thomas—was exempt from the Investment Advisers Act of 1940 (the "IAA"). We hold that Robert and Amanda Thomas—the only plaintiffs in this proceeding—do not have standing to appeal

- 2 -

the first issue.  Therefore, we dismiss that part of the appeal without considering the merits.  We affirm the district court's grant of summary judgment on the second issue.

Background

Because this is an appeal from the grant of summary judgment, we view the facts and draw all reasonable inferences in Plaintiffs' favor.  Scott v. Harris, 550 U.S. 372, 378 (2007).  We first discuss the facts pertaining to Plaintiffs' claims under the IAA, followed by the procedural history relevant to the district court's refusal to grant leave to amend the SAC.

A.    Factual Background: Investment Advisers Act Claim

In 2001, Plaintiffs met with Jeffrey Laxton, a Financial Services Representative ("FSR") employed by Met.  CJA[1] 130.  Mr. Laxton analyzed the Thomases' financial situation and advised them on how to allocate the funds in their 401(k).  Id. 142.  Met required its FSRs to conduct this "suitability analysis" to ensure that they recommended appropriate investment and insurance products. JA 294-97, 309-10.  Mr. Laxton was not compensated upon completing the suitability analysis.  Id. at 337.  In April of 2003, the Thomases had a child and became interested in purchasing financial assets to secure the child's future.  CJA

---

[1] Part of the parties' joint appendix ("JA") was filed under seal as a confidential joint appendix ("CJA").  We will refer to either as the parties have.

142-43. Based in part on his prior financial analysis, Mr. Laxton advised them to purchase a variable universal life insurance policy ("VULP") from Met. Id. 144. Plaintiffs promptly heeded this advice. Id. They have since paid a $91.00 monthly premium. Id. The VULP's prospectus stated that 2.25% of the premiums were dedicated to compensating FSRs. Id. at 146. After the sale, Met paid Mr. Laxton a $500 "production credit." Id. at 147; JA 393.

Met compensates FSRs based on their sales of proprietary products. CJA 147. If FSRs fail to sell enough products, they may be terminated. Id. Met's marketing policy, according to Plaintiffs, requires FSRs to provide investment advice to potential customers as a means to sell more proprietary products. Id. at 138. This policy was so pervasive that FSRs allegedly gave financial advice to every customer to whom they sold a product. Id.

In their complaint, Plaintiffs contend that FSRs are "investment advisers" subject to regulation under the IAA. Id. at 2. The IAA, *inter alia*, imposes fiduciary duties on investment advisers. See SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 191-92 (1963). Plaintiffs allege that Mr. Laxton (and, derivatively, Met) violated the IAA by failing to disclose that he had strong incentives to sell Met's proprietary products, as opposed to giving unbiased advice. CJA 2.

Defendants claim that Mr. Laxton falls within the IAA's so-called "broker-dealer" exemption, which exempts from the IAA brokers and dealers who give

advice "solely incidental to" their conduct as a broker-dealer and who receive "no special compensation" for the advice. JA 155-56; 15 U.S.C. § 80b-2(a)(11)(C) (2006). The district court agreed with Defendants and granted summary judgment on this basis. See Thomas v. Metro. Life Ins. Co., No. 07-0121, 2009 WL 2778663, at *3-9 (W.D. Okla. Aug. 31, 2009).

So far as we are aware, application of the broker-dealer exemption to these circumstances is an issue of first impression among the federal appellate courts. Before we reach the district court's grant of summary judgment, however, we must discuss the case's procedural history and Plaintiffs' claim that the district court should have granted leave to amend the complaint.

B.    Litigation History

On January 31, 2007, Robert Thomas filed a complaint on behalf of himself and others who had bought proprietary Met products. JA 724. The complaint alleged claims under section 10(b) of the Securities Exchange Act of 1934, the IAA, several state statutes, and state common law. Doc. 1 at 1-2, 4-5. In September 2007 Mr. Thomas—along with two additional named plaintiffs, Jay Stout and Carolyn Ising, who had purchased securities and a financial plan from Met—filed the SAC, which alleged essentially the same claims. See JA 731; Thomas v. Metro. Life Ins. Co., 540 F. Supp. 2d 1212, 1214-18 (W.D. Okla. 2008). Met moved to dismiss. The district court dismissed the state law claims, and Plaintiffs do not contest that ruling. Id. at 1232-33; see Aplt. Br. 4 n.2. The

- 5 -

district court also dismissed the federal securities fraud claims but allowed a period for discovery to resolve issues surrounding the plaintiffs' standing—specifically, whether any of the named plaintiffs had purchased mutual funds or securities during the relevant period. See Metro. Life Ins., 540 F. Supp. 2d at 1231-32.

Discovery revealed that the named Plaintiffs had purchased only life insurance products—not securities or mutual funds—from Met during the class period. Doc. 127 at 1-2. Thus, no named Plaintiffs had standing to bring securities fraud claims. Plaintiffs moved for leave to amend the complaint to add as named plaintiffs persons who did purchase securities or mutual funds during the relevant time frame and who could therefore bring securities fraud claims. See JA 33, 41. In a two-page minute order, the district court partially denied Plaintiffs' motion. Id. at 133-34.

Although it denied the majority of Plaintiffs' requests in their motion for leave to amend the SAC, the district court did grant leave to file a Third Amended Complaint ("TAC") to add Amanda Thomas, Robert Thomas's wife, as an additional named plaintiff. Aplee. Supp. App. 71. Plaintiffs Robert and Amanda Thomas filed the TAC, which brought the only claims the Thomases had standing to assert—the IAA claims discussed above. CJA 1. Although the TAC is styled as a class action, the district court has neither certified nor denied certification of a class. Robert and Amanda Thomas—the only Plaintiffs-Appellants in this

appeal—argue that the district court abused its discretion in refusing to allow as named plaintiffs persons who had standing to assert securities fraud claims. Aplt. Br. 54.

## Discussion

### A.     Standing: Leave to Amend to Add Securities Fraud Claims

Although neither party has disputed Plaintiffs' standing to appeal the district court's denial of leave to amend the complaint, "we have an independent duty to examine our own jurisdiction." Amazon, Inc. v. Dirt Camp, Inc., 273 F.3d 1271, 1274 (10th Cir. 2001). Thus, we raise the issue *sua sponte*.

"The standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." Arizonans for Official Engl. v. Arizona, 520 U.S. 43, 64 (1997) (citing Diamond v. Charles, 476 U.S. 54, 62 (1986)). Therefore, "[t]o have standing [on appeal], one must be aggrieved by the order from which appeal is taken." Uselton v. Commercial Lovelace Motor Freight, Inc., 9 F.3d 849, 854 (10th Cir. 1993) (citation omitted); Sabido Valdivia v. Gonzales, 423 F.3d 1144, 1147 (10th Cir. 2005); accord Tachiona v. United States, 386 F.3d 205, 211 (2d Cir. 2004). Just like litigants generally cannot bring suit to vindicate the rights of others, see RMA Venture Cal. v. SunAmerica Life Ins. Co., 576 F.3d 1070, 1073 (10th Cir. 2009), parties generally do not have standing to appeal in order to protect the

- 7 -

rights of third parties.  See Howard v. Mail-Well Envelope Co., 150 F.3d 1227, 1230 (10th Cir. 1998) (citation omitted).

Machella v. Cardenas, 653 F.2d 923 (5th Cir. 1981), is particularly relevant here.  In that case, Mr. Machella brought a putative class action against the Small Business Administration concerning loan forgiveness in a federal disaster relief program.  Machella, 653 F.2d at 925.  Before a class was certified, Mr. Machella attempted to amend his complaint to add a third party, Shirley Shaw, as a party plaintiff.  Id. at 927.  The district court denied leave to amend and eventually dismissed the case.  Id.  On appeal, Mr. Machella sought review of both the district court's decision on the merits and its refusal to grant leave to amend the complaint.  Id. at 925, 927.  The Fifth Circuit dismissed the second issue for lack of jurisdiction.  Id. at 927.  The court held that Mr. Machella was not aggrieved by the court's denial of leave to amend—the only person aggrieved was the potential new plaintiff, who did not appeal the order.  Id.  Therefore, Mr. Machella did not have standing to appeal the issue, and the court did not have jurisdiction to consider it.  Id.

Our case is indistinguishable.  Robert Thomas, Carolyn Ising, and Jay Stout sought leave to amend the class-action complaint in order to add named plaintiffs who had standing to assert securities fraud claims.  JA 33.  It is undisputed that neither Amanda nor Robert Thomas—the only Plaintiffs-Appellants before us—have standing to bring securities fraud claims.  The district court denied the

motion, but permitted Amanda Thomas to be added as a plaintiff to assert her IAA claims. Id. at 133-34. Amanda and Robert Thomas then filed the TAC, in which they asserted all the claims they had standing to assert—the IAA claims that form the basis of the second issue on appeal. Accordingly, Robert and Amanda Thomas were not aggrieved by the district court's order and do not have standing to challenge it on appeal.

It makes no difference that this lawsuit is styled as a putative class action. Prior to class certification, the named plaintiffs' failure to maintain a live case or controversy is fatal to the case as a whole—that unnamed plaintiffs might have a case or controversy is irrelevant. See Clark v. State Farm Mut. Auto. Ins. Co., 590 F.3d 1134, 1138 (10th Cir. 2009); accord Machella, 653 F.2d at 927. As discussed above, the Thomases were not aggrieved by the district court order and their appeal constitutes an attempt to protect the rights of third parties. They have no standing to do so, see Uselton, 9 F.3d at 854, and we dismiss that part of the appeal without considering the merits. We do have jurisdiction over Plaintiffs' appeal from the grant of summary judgment under 28 U.S.C. § 1291 and consider that next.

B.    Summary Judgment: Investment Advisers Act Claims

Our review of a summary judgment order is *de novo* and we apply the same standard as the district court. See Oldenkamp v. United Am. Ins. Co., 619 F.3d 1243, 1246 (10th Cir. 2010). We view the evidence and its reasonable inferences

in the light most favorable to the non-movant.  Id.  Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" on the issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is material "if under the substantive law it is essential to the proper disposition of the claim."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citing Anderson, 477 U.S. at 248).

Statutory interpretation is a matter of law appropriate for resolution on summary judgment.  See State of Okla. ex rel. Dept. of Human Servs. v. Weinberger, 741 F.2d 290, 291 (10th Cir. 1983).  In this case, we first interpret the IAA's broker-dealer exemption and then determine whether, given the correct interpretation, the record reveals a genuine dispute of material fact for trial.

*1.      Interpretation of the Broker-Dealer Exemption*

This case centers around the proper interpretation of the IAA.  Generally, the IAA imposes fiduciary duties on "investment advisers."  See 15 U.S.C. § 80b-6.  "Investment advisers" include, in relevant part, "any person who, for compensation, engages in the business of advising others . . . as to the advisability of investing in, purchasing, or selling securities."  Id. § 80b-2(a)(11).  The term "compensation" has been defined broadly as "the receipt of any economic benefit,

- 10 -

whether in the form of an advisory fee or some other fee related to the total services rendered, commissions, or some combination of the foregoing." United States v. Elliot, 62 F.3d 1304, 1311 n.8 (11th Cir. 1995) (citing Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services, Investment Advisers Act Release No. 1092, 52 Fed. Reg. 38400, 38403 (Oct. 8, 1987)).

Although the general definition of "investment adviser" is broad, it contains several specific exemptions. Relevant here is subsection (a)(11)(C), which exempts from the definition of "investment adviser"—and hence from the IAA's substantive provisions—"any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor." 15 U.S.C. § 80b-2(a)(11)(C). "Such services" refers to the services set forth in the initial definition: "advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." Id. § 80b-2(a)(11). "Therefor" refers to "such services." Id. So, subsection (a)(11)(C), the "broker-dealer" exemption, exempts brokers and dealers who give investment advice so long as (1) the advice is solely incidental to their conduct as brokers or dealers, and (2) they receive no special compensation for that advice. The two requirements are conjunctive; in order to be exempted, broker-dealers must satisfy

both.

The district court held that Mr. Laxton fell within the IAA's broker-dealer exemption.  See Thomas, 2009 WL 2778663, at *9.  Specifically, the district court held that the phrase "solely incidental to" means "solely attendant to" or "solely in connection with," as opposed to "solely a minor part of" or "solely an insignificant part of."  Id. at *6-7.  Thus, the court held that applicability of the exemption depends not on the quantum or importance of the broker-dealer's advice, but rather on whether the broker-dealer gives advice in connection with the sale of a product.  Id.  With regard to the second prong, the district court held that "special compensation" requires a clearly definable charge attributable to investment advice.  Id. at *7-8.  Thus, according to the district court, compensation in the form of brokerage commissions—which is received for the sale of a product—is not "special compensation," even when the transaction leading to the sale involved investment advice.  Id. at *8.  The court based its interpretation on the statute's plain language, its legislative history as interpreted by the D.C. Circuit in Fin. Planning Ass'n v. SEC, 482 F.3d 481 (D.C. Cir. 2007), and several SEC releases.  Id. at *3-9.

On appeal, Plaintiffs challenge the district court's interpretation.  Aplt. Br. 16-20.  They argue that the phrase "solely incidental to" refers to the quantum or importance of advice given, not whether the advice is connected to the sale of the product.  Id. at 26-27.  Thus, according to Plaintiffs, Mr. Laxton did not meet the

first prong of the broker-dealer exemption because investment advice formed a "central component" to all Mr. Laxton's transactions. Id. at 43. Plaintiffs argue that their proposed interpretation better advances the IAA's purpose, which "was to dramatically expand the scope of fiduciary obligations to persons who provide financial services to consumers." Id. at 32. Additionally, they argue that "special compensation" is received any time a broker receives economic benefit from a transaction involving investment advice. Id. at 50. In the alternative, they argue that even under the district court's interpretation, genuine issues of fact remain as to whether Mr. Laxton received special compensation for his advice. Id. at 51-52.

After carefully reviewing the parties' contentions, we conclude that the district court properly interpreted the IAA's broker-dealer exemption. That interpretation comports with the IAA's language, legislative history, and the position taken by the SEC.

*a. "Solely Incidental To"*

Our analysis starts with the plain language of the statute. See, e.g., Wright v. Fed. Bureau of Prisons, 451 F.3d 1231, 1234 (10th Cir. 2006) (citation omitted). "We read the words of the statute in their context and with a view to their place in the overall statutory scheme." Id. (internal quotation marks and citations omitted). If the statutory language is clear, our analysis ends and we must apply its plain meaning. United States v. Husted, 545 F.3d 1240, 1245 (10th Cir. 2008). However, "[i]f the court finds the statute ambiguous, the court then

looks beyond the plain text to resolve the ambiguity, examining legislative intent [and] overall statutory construction." United States v. Hinckley, 550 F.3d 926, 932 (10th Cir. 2008) (footnote and citation omitted). A statute is ambiguous if "it is capable of being understood by reasonably well-informed persons in two or more different senses." Id. (internal quotation marks and citation omitted).

The IAA does not define the phrase "solely incidental to." See 15 U.S.C. § 80b-2. Dictionary definitions of the word "incidental" differ somewhat.[2] However, all definitions establish that the word "incidental" has two components. To be considered incidental, two actions or objects must be related in a particular way—the incidental action or object must occur only as a result of or in connection with the primary. Additionally, the incidental action or object must be secondary in size or importance to the primary.

Plaintiffs emphasize the second component of the definition, arguing that

---

[2] See, e.g., Black's Law Dictionary 830 (9th ed. 2009) ("Subordinate to something of greater importance; having a minor role. . . ."); Webster's Unabridged Dictionary 966 (2d ed. 2001) ("1: happening or likely to happen in an unplanned or subordinate conjunction with something else. 2: incurred casually and in addition to the regular or main amount: *incidental expenses*. 3: likely to happen or naturally appertaining (usually fol. by *to*). . . .); Webster's New International Dictionary 1257 (2d ed. 1956) ("1: Happening as a chance or undesigned feature of something else; casual; hence, not of prime concern; subordinate; as, an *incidental* expense. 2: Liable to happen or to follow as a chance feature or incident; as, the trials *incidental* to married life. . . ."); Black's Law Dictionary 942-43 (3d ed. 1933) ("Depending upon or appertaining to something else as primary; something necessary, appertaining to, or depending upon another which is termed the principal; something incidental to the main purpose.").

"dictionary definitions of 'incidental' universally support Plaintiffs' interpretation of the term as 'inconsequential,' 'non-central,' or 'non-mandatory.'" Aplt. Br. 25-26. Yet, the relational aspect is equally important and cannot be ignored—to be considered incidental, an action or object must be of lesser size or importance <u>and</u> be undertaken in connection with the primary action or object. The district court's interpretation acknowledges both components of "incidental," while the Plaintiffs' proposed interpretation would have us focus on the quantum or importance of the advice without regard to its relationship with the broker-dealer's business.

Further, the phrase "solely incidental to," when read as a whole, makes more sense under the district court's interpretation. "Solely," of course, means "exclusively or only." Webster's Unabridged Dictionary 1815 (2d ed. 2001). This compliments the relational aspect of "incidental": "solely" modifies "incidental to," and the phrase as a whole renders the exemption applicable only when the broker-dealer gives advice in connection with the sale of a product. Under Plaintiffs' proposed reading, application of the exemption would hinge upon the quantum or importance of the broker-dealer's advice. Besides creating a difficult problem of line-drawing—how much advice is too much, and how could we measure the importance of the advice?—under Plaintiffs' interpretation "solely" would not meaningfully modify "incidental to" and would be superfluous. We are unwilling to adopt such an interpretation.

Accordingly, the plain text of the statute supports the district court's interpretation, which we adopt. Sources beyond the plain text confirm this result.

The SEC is charged with implementing the IAA. See 15 U.S.C. § 80b-11(a). Therefore, we would defer to the SEC's interpretation if it were embodied in a rule or regulation that has the force of law. See Newton v. F.A.A., 457 F.3d 1133, 1136-37 (10th Cir. 2006) (quoting United States v. Mead Corp., 533 U.S. 218, 226-27 (2001)). However, the SEC has not promulgated such a rule or regulation.[3] Therefore, we consult the SEC's position only for its persuasive value. Via Christi Reg'l Medical Cntr., Inc. v. Leavitt, 509 F.3d 1259, 1272 (10th Cir. 2007) (quoting Christensen v. Harris Cnty., 529 U.S. 574, 587 (2000) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944))).

Since its first release on the issue in 1946, the SEC's position has been consistent: in the IAA, Congress recognized that "brokers and dealers commonly give a certain amount of advice to their customers in the course of their regular business, and it would be inappropriate to bring them within the scope of the

---

[3] In 2005 the SEC promulgated a rule that, *inter alia*, interpreted the broker-dealer exemption. See Certain Broker-Dealers Deemed Not To Be Investment Advisers, Investment Advisers Act Release No. 2376, 70 Fed. Reg. 2716, 2726 (Jan. 14, 2005). However, that rule was vacated on other grounds by the D.C. Circuit in Fin. Planning Ass'n, 482 F.3d 481. Thus, the entire rule no longer has the force of law, and we will not afford it Chevron deference, even though the interpretation of the broker-dealer exemption was not cast into doubt. In 2007, the SEC proposed a new rule containing the same interpretation. See Interpretive Rule Under the Advisers Act Affecting Broker-Dealers, Investment Advisers Act Release No. 2652, 72 Fed. Reg. 55127 (Sept. 28, 2007). However, no final rule with the force of law has been adopted.

[IAA] merely because of this aspect of their business." Opinion of General Counsel Relating to Section 202(a)(11)(C) of the Investment Advisers Act of 1940, Investment Company Act Release No. 2, 11 Fed. Reg. 10996, 10996 (Sept. 27, 1946). More specifically, the SEC has indicated that advice is "solely incidental to" a broker-dealer's business "when the advisory services rendered to an account are <u>in connection with and reasonably related to</u> the brokerage services provided to that account." <u>See</u> Certain Broker-Dealers Deemed Not To Be Investment Advisers, Investment Advisers Act Release No. 2340, 70 Fed. Reg. 2716, 2726 (Jan. 14, 2005) (emphasis added) [hereinafter "Vacated Rule"], *vacated on other grounds*, <u>Fin. Planning Ass'n</u>, 482 F.3d 481; Interpretive Rule Under the Advisers Act Affecting Broker-Dealers, Investment Advisers Act Release No. 2652, 72 Fed. Reg. 55126 (Sept. 28, 2007) (proposed rule) [hereinafter "Proposed Rule"].

Thus, the SEC's position is that application of the broker-dealer exemption hinges upon whether the advice in question relates to or is connected with the broker-dealer's primary business—not upon the quantum or importance of that advice. This position is based on the SEC's analysis and interpretation of the statutory history, as well as its knowledge of the historical practices of brokers and dealers. <u>See</u> Vacated Rule at 2726-27; Proposed Rule at 55127-28. The SEC has particular expertise in this area, and we find its position persuasive.

Our interpretation also finds support in legislative history. The IAA was

the last of a series of regulatory laws passed in response to the stock market crash of 1929.  See Fin. Planning Ass'n, 482 F.3d at 483; Arthur B. Laby, Reforming the Regulation of Broker-Dealers and Investment Advisers, 65 BUS. LAW. 395, 402 (2010) [hereinafter Laby, Reforming the Regulation of Broker-Dealers].  One of the earlier statutes, the Public Utility Holding Company Act of 1935, commissioned the SEC to conduct a study on investment trusts and investment advisers.  Laby, Reforming the Regulation of Broker-Dealers, at 402.  The SEC conducted the study and noted that a large number of people had begun to market themselves as professional "investment counsel."  See H.R. Doc. No. 477, at 28 (1939).  This emerging group purported to give unbiased advice in exchange for compensation.  Id.  These activities were largely unregulated and, in the SEC's view, posed a substantial risk to investors.  Id.  Of particular concern were brokerage businesses that divided into two segments: one that acted as traditional brokers and sold securities and another that gave—and was compensated for—investment advice as a distinct product.  Amicus Curiae ACLI Br. 10-11 [hereinafter Amicus Br.]; see H.R. Doc. No. 477.

In response, Congress introduced bills that became the IAA.  See S. 3580, 76th Cong. (1940); H.R. 10065, 76th Cong. (1940).  As the bills advanced in the House and Senate, members of Congress acknowledged that investment brokers and dealers—who were regulated under the Securities Exchange Act of 1934, see Laby, Reforming the Regulation of Broker-Dealers, at 403; Amicus Br. 7—gave

- 18 -

investment advice yet were not the target of the new regulation. See Fin.

Planning Ass'n, 482 F.3d at 485; H.R. Doc. No. 477, at 3; 86 Cong. Rec. 2847

(1940); 86 Cong. Rec. 9813 (1940). Instead, the IAA targeted the emerging group

of professional investment advisers: those persons who gave investment advice as

a product separate and apart from the sale of securities. Our interpretation of

"solely incidental to" comports with this history—broker-dealers meet the first

prong of the exemption so long as they give investment advice only in connection

with the primary business of selling securities. On the other hand, broker-dealers

who give advice that is not connected to the sale of securities—or whose primary

business consists of giving advice—do not meet the first prong of the broker-

dealer exemption.

### b. *"Special Compensation"*

The second prong of the broker-dealer exemption is more straightforward.

Broker-dealers who give incidental advice are exempted from the IAA so long as

they "receive[] no special compensation therefor." 15 U.S.C. § 80b-2(a)(11)(c).

On its face, the second prong of the exemptions reveals two requirements: (1)

compensation must not be "special," and (2) compensation must not be received

in exchange for investment advice.

The IAA does not define the phrase "special compensation." However,

surrounding phrases and statutory context often clarify the meaning of an

undefined term. See, e.g., United Sav. Ass'n of Tex. v. Timbers of Inwood Forest

Assoc., Ltd., 484 U.S. 365, 371 (1988). In this case, the use of the word "compensation" in subsection (a)(11) and the overall context of the broker-dealer exemption—in particular, its reference to the "business of a broker or dealer"—clarifies that "special compensation" means compensation received specifically for investment advice in a form other than traditional commissions or analogous transaction-based compensation.

The IAA defines "Investment Adviser" to include "any person who, for compensation, engages in the business of advising others" with regard to securities. 15 U.S.C. § 80b-2(a)(11) (emphasis added). In United States v. Elliot, the Eleventh Circuit defined "compensation" to encompass "any economic benefit" received from a business that involves giving investment advice. 62 F.3d at 1311 n.8 (internal quotation marks and citation omitted). Thus, if a person receives an economic benefit from a business that includes the giving of investment advice, that person falls within the initial, broad definition of "investment adviser." Id. at 1311.

The broker-dealer exemption, however, excludes broker-dealers who give incidental advice so long as they receive no special compensation for the investment advice. See 15 U.S.C. § 80b-2(a)(11)(C). As the district court correctly noted, "the statute clearly differentiates between 'compensation' and 'special compensation.'" Thomas, 2009 WL 2778663, at *7 (citing Russello v. United States, 464 U.S. 16, 23 (1983)). Thus, the phrase "special compensation"

refers to some subset of the economic benefit received from a transaction involving investment advice.

But what subset of economic benefit constitutes "special compensation"? The context of the broker-dealer exemption provides an answer. The exemption as a whole refers to a broker-dealer's "conduct of his business as a broker or dealer." 15 U.S.C. § 80b-2(a)(11)(C). Thus, the natural reading of the phrase "special compensation" is compensation—that is, economic benefit, see Elliot, 62 F.3d at 1311 n.8—other than that received in the normal course of a broker-dealer's business. At the time the IAA was passed, broker-dealers were normally compensated by commissions. See Fin. Planning Ass'n, 482 F.3d at 485. Thus, "special compensation" refers to economic benefit that is received specifically for investment advice, in a form other than a commission for the sale of the underlying product.

Reading the second prong of the exclusion as a whole, we reach the following conclusion: compensation received by a broker-dealer is "special" only when (1) the compensation is received specifically in exchange for giving advice, as opposed to some other service, and (2) the compensation takes a form other than a commission or analogous transaction-based compensation received for the sale of a product.

Our interpretation is consistent with the SEC's position,[4] which is that "special compensation" requires a "a clearly definable charge for investment advice."  Final Extension of Temporary Exemption from the IAA for Certain Brokers and Dealers, Investment Advisers Act Release No. 628, 43 Fed. Reg. 19224, 19226 (May 4, 1978).  "This reflects the [Division of Investment Management's] position that a client who perceives that he is paying a charge specifically for investment advice is entitled to the protections of the Advisers Act."  Id.; see also Proposed Rule at 55129 (noting the SEC's "longstanding view that, with respect to brokerage commissions or other transaction-based compensation, broker-dealers receive 'special compensation' where there is a clearly definable charge for investment advice" (footnote omitted)); id. ("[A] broker-dealer will not be considered to have received 'special compensation' for purposes of section 202(a)(11)(C) of the Advisers Act (and therefore will not be subject to the Act) solely because the broker-dealer charges a commission, mark-up, mark-down or similar fee for brokerage services that is greater or less than one it charges another customer." (footnote omitted)); Private Ledger, SEC No-Action Letter, 1989 WL 246513 (Nov. 17, 1989) ("Special compensation means any compensation other than that received by a broker-dealer in the ordinary course of business." (citations omitted)).

---

[4]  Again, the SEC has not adopted a final rule expressing its position. Thus, we defer to the SEC's interpretation only to the extent that we find it persuasive.  See Via Christi Reg'l Medical Cntr., Inc., 509 F.3d at 1272.

Our interpretation also finds support in the IAA's legislative history. During passage of the bills that eventually became the IAA, both the House and Senate acknowledged that the IAA excludes broker-dealers who "receive only brokerage commissions" for transactions involving incidental investment advice. S. Rep. No. 1775, at 22 (1940); H. Rep. No. 2639, at 28 (1940); 86 Cong. Rec. 9813 (1940); 86 Cong. Rec. 10077 (1940).

Finally, our interpretation makes sense in light of the historical context in which the IAA was passed. As mentioned above, the IAA was passed in response to an SEC report that detailed the emergence of a largely unregulated community of professional investment advisers. See H.R. Doc. No. 477. Two characteristics distinguished investment advisers from broker-dealers: the fact that investment advisers gave advice for its own sake; and the fact that investment advisers were compensated specifically for that advice. See Laby, Reforming the Regulation of Broker-Dealers, at 400-01; Opinion of General Counsel Relating to Section 202(a)(11)(C) of the Investment Advisers Act of 1940, Investment Company Release No. 2, 11 Fed. Reg. 10996 (Sept. 27, 1946); Fin. Planning Ass'n, 482 F.3d at 485. Our interpretation of "special compensation" maintains this distinction: broker-dealers who are compensated for the sale of products by traditional commissions meet the second prong of the exemption; brokers and dealers who receive compensation specifically for rendering advice, in a form other than commissions for the entire transaction, do not.

Plaintiffs argue that a broker-dealer receives "special compensation" whenever the broker-dealer receives an economic benefit from a transaction involving investment advice. See Aplt. Br. 50. However, this interpretation would render the word "special" superfluous and ignore the statute's clear distinction "between 'compensation' and 'special compensation.'" Thomas, 2009 WL 2778663, at *7 (citing Russello v. United States, 464 U.S. 16, 23 (1983)). Further, it would collapse the exemption's two prongs into one: under Plaintiffs' interpretation, if a broker-dealer receives compensation from a transaction involving investment advice, application of the exemption would depend only upon whether the advice was "solely incidental to" the transaction. We are unwilling to adopt such an interpretation.

To summarize our holdings: the IAA excludes a broker-dealer who provides advice that is attendant to, or given in connection with, the broker-dealer's conduct as a broker or dealer, so long as he does not receive compensation that is (1) received specifically in exchange for the investment advice, as opposed to for the sale of the product, and (2) distinct from a commission or analogous transaction-based form of compensation for the sale of a product. The quantum or importance of the broker-dealer's advice is relevant only insofar as the advice cannot supersede the sale of the product as the "primary" goal of the transaction or the "primary" business of the broker-dealer.

*c. Summary Judgment*

Under the appropriate reading of the IAA, the district court correctly granted summary judgment in favor of Defendants. It is undisputed that Mr. Laxton was acting as a broker during the relevant time frame, and that Mr. Laxton would be covered by the IAA if not for the broker-dealer exemption. Thus, summary judgment was appropriate if there are no genuine disputes of material fact that (1) Mr. Laxton's advice was given in connection with his conduct as a broker or dealer, (2) Mr. Laxton did not receive compensation that was (a) in exchange for his advice, as opposed to for the sale of the product, and (b) distinct from traditional, transaction-based compensation.

Taking all the facts and inferences therefrom in favor of the Plaintiffs, there are no genuine disputes of material fact, and Mr. Laxton is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). First, the record establishes that Mr. Laxton's advice was given only in connection with selling the VULP to Plaintiffs. In the course of these proceedings, Plaintiffs have argued—and produced evidence tending to prove—that Defendants used investment advice as a strategy to sell proprietary products. CJA 138. Mr. Laxton followed these sales policies. Id.; JA 294-97, 309-10. Mr. Laxton's advice was closely related to the sale of the VULP and selling the VULP was the primary object of the transaction. Accordingly, the record establishes that Mr. Laxton's advice was "solely incidental to" his conduct as a broker. 15 U.S.C.

§ 80b-2(a)(11)(C).

With regard to the second prong, the record also establishes that Mr. Laxton was compensated for the sale of the VULP, not for the investment advice he rendered. Plaintiffs allege that Mr. Laxton provided investment advice on several occasions. CJA 130, 142. However, he was compensated only once—after the VULP was sold. Id. at147; JA 293-94. In fact, Mr. Laxton would have been discharged—and thus not compensated—had he not reached his "production goals," as measured by the sale of proprietary products. CJA 147. Accordingly, Mr. Laxton's compensation was tied to selling products, not to giving investment advice.

Plaintiffs submit that Mr. Laxton received other benefits, such as life and health insurance, for reaching his sales goals. Id. at 147. However, there is no evidence that Mr. Laxton would have received more benefits had he rendered more advice without selling more products. This establishes that Mr. Laxton received compensation for selling products, not for giving advice.

Finally, the record establishes that the $500 Mr. Laxton received after he sold the VULP was a traditional, transaction-based brokerage commission. The "Field Representative's" report styles the $500 as a "Production Credit" for the sale of the VULP—clearly a commission. JA 393. That the actual amount of the commission Mr. Laxton received varied from the "sales charge" identified in the prospectus is of no consequence. The compensation—whatever the amount—was

predicated on the sale of the VULP. This is the hallmark of a traditional commission. Thus, not only did Mr. Laxton not receive compensation specifically for rendering advice; the compensation he received constituted a traditional brokerage commission for the sale of a product and thus was not "special." Therefore, the record establishes that Mr. Laxton meets the second prong of the broker-dealer exemption.

Plaintiffs argue that, because they provided a "link" between the advice and Mr. Laxton's compensation, a jury should determine as a matter of fact whether Mr. Laxton was compensated for rendering investment advice or for selling the product. Aplt. Br. 52. However, the record establishes the contrary—Mr. Laxton received compensation only after selling the VULP; Mr. Laxton would have been fired if he did not complete a certain amount of sales; Mr. Laxton gave advice on other occasions, but was not compensated for it. These undisputed facts compel the conclusion that Mr. Laxton was compensated for selling the product, not specifically for rendering advice. There is no evidence from which a reasonable jury could conclude that Mr. Laxton's compensation constituted "special compensation" for investment advice.

The record shows that Mr. Laxton gave advice that was "solely incidental to his conduct as a broker or dealer," and that he "received no special compensation therefor." 15 U.S.C. § 80b-2(a)(11)(C). Accordingly, there are no genuine disputes of material fact for trial and Defendants were entitled to

judgment as a matter of law.

We DISMISS that portion of the appeal concerning the denial of leave to amend to add securities fraud claims. The district court's judgment on the IAA claims is AFFIRMED.