FILED
United States Court of Appeals
Tenth Circuit

April 25, 2016

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BWP MEDIA USA, INC., d/b/a
Pacific Coast News; NATIONAL
PHOTO GROUP, LLC,

      Plaintiffs - Appellants,

v.

CLARITY DIGITAL GROUP, LLC,
n/k/a AXS DIGITAL MEDIAL
GROUP, LLC,

      Defendant - Appellee.

No. 15-1154

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 14-CV-00467-PAB-KMT)**

---

Craig B. Sanders (and Jonathan M Cader, with him on the briefs) of Sanders Law,
PLLC, Garden City, New York, for Plaintiffs - Appellants.

Steven D. Zansberg of Levine Sullivan Koch & Schulz, LLP, Denver, Colorado,
for Defendant - Appellee.

---

Before **KELLY**, **MATHESON**, and **MORITZ**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Plaintiff-Appellant BWP Media USA, Inc. d/b/a Pacific Coast News and National Photo Group, LLC ("BWP") appeals from the district court's summary judgment in favor of Defendant-Appellee Clarity Digital Group, LLC n/k/a AXS Digital Media Group, LLC ("AXS"). See BWP Media USA Inc. v. Clarity Dig. Grp., LLC, No. 14-cv-00467-PAB-KMT, 2015 WL 1538366 (D. Colo. Mar. 31, 2015). BWP owns the rights to photographs of various celebrities. In February 2014, BWP filed a complaint alleging that AXS infringed its copyrights by posting 75 of its photographs without permission on AXS's website, Examiner.com.[1] AXS asserted it was protected from liability by the safe harbor provision of the Digital Millennium Copyright Act ("DMCA") and moved for summary judgment. The district court agreed. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

Background

A.    The DMCA

Recognizing the need "to update domestic copyright law for the digital age," Congress enacted the DMCA. Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 26 (2d Cir. 2012). Section 512 of the DMCA contains a safe harbor provision protecting online and internet service providers ("ISPs") from monetary

---

[1] In response to a July 2013 letter by BWP notifying AXS of the copyright violations, AXS promptly removed the photographs and notified BWP. J.A. 99.

liability, only allowing for limited injunctive relief, when copyright infringement occurs through use of the service. 17 U.S.C. § 512(c). The safe harbor provision is designed to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements," while simultaneously providing "greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities." H.R. Rep. No. 105-551, pt. 2, at 49-50 (1998). To benefit from safe harbor protection, the ISP must first show that the infringing content was stored "at the direction of a user." 17 U.S.C. § 512(c)(1). Once this is established, there are numerous factors which must be satisfied to come within the protection of the safe harbor.[2] Specific to this case, an ISP will not qualify for safe harbor

---

[2] The statute provides:

(c)      Information residing on systems or networks at direction of users. — (1) In general.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

protection if it had either actual knowledge of the infringement or knowledge of facts or circumstances from which infringing activity is apparent.  Id. § 512(c)(1)(A)(i)-(ii).  Additionally, if the ISP became aware of the infringement and did not act expeditiously to remove or disable access to the content, it cannot qualify for safe harbor protection.  Id. § 512(c)(1)(A)(iii).

B.     Infringing Activity on Examiner.com

Examiner.com characterizes itself as a "dynamic entertainment, news and lifestyle network that serves more than 20 million monthly readers across the U.S. and around the world."  About Us, Examiner.com (Mar. 18, 2016, 9:10AM), http://www.examiner.com/About_Examiner.  Rather than hiring a centralized writing staff, the content generated on Examiner.com is created by independent contractors, called "Examiners," all over the world.  To become an Examiner, the writer must fill out an application including a proposed topic and a short writing sample.  Examiner.com evaluates the writing sample, conducts a background check, and, assuming the application is approved, the Examiner enters into a

---

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c).

-4-

contract entitled the Independent Contractor and Agreement License with

Examiner.com. The contract expressly provides that: (1) Examiners are

independent contractors, not employees[3] and (2) copyright infringement is

prohibited.[4] Because it was a group of Examiners that posted the infringing

content on Examiner.com, AXS asserted it was protected under the DMCA's safe

harbor provision.

On appeal, BWP argues that AXS should not be protected by § 512's safe

harbor for two reasons. First, BWP argues AXS cannot get past the threshold

requirement that the infringing content be stored "at the direction of a user." 17

U.S.C. § 512(c)(1). Specifically, BWP argues that: (1) Examiners are not "users,"

but (2) even if Examiners are "users," AXS directed the Examiners to post the

infringing content. Second, BWP claims that even if AXS satisfies this threshold,

safe harbor protection does not apply because AXS had actual or circumstantial

knowledge of the infringement. Id. § 512(c)(1)(A)(i)-(ii). We review the district

court's grant of summary judgment de novo. Timmons v. White, 314 F.3d 1229,

_____

[3] The contract states, "You will provide the Services hereunder as an independent contractor and not as the agent, employee, legal representative, partner, or joint venturer of Examiner.com." J.A. 138.

[4] The contract provides: (1) "You must have permission from the owner/copyright holder of any content before including it on your Web Page, unless it was provided by Examiner.com;" (2) "Do not include any copyrighted material on our site (including text, photos, video, audio, or anything else) without the permission of the owner;" and (3) "You also may not post any content that infringes any . . . copyright." J.A. 134; 141.

1232 (10th Cir. 2003).  We reject each argument raised by BWP.


## Discussion

A.  Section 512's threshold requirement, that the infringing content be stored at the direction of a "user," is satisfied.

The DMCA's safe harbor requires that the infringing content be stored at the direction of a "user."  BWP attempts to divide this requirement into two distinct inquiries, asking who is a "user" and who directed the infringing content to be stored.  As explained below, the key to interpreting this requirement is not to isolate certain words but rather, to take the provision as a whole, giving meaning to each word in context.

1.    The word "user" in the DMCA should be interpreted according to its plain meaning.

We are often tasked with interpreting complex statutory language but, when "the statutory language is clear, our analysis ends and we must apply its plain meaning."  Thomas v. Metro. Life Ins. Co., 631 F.3d 1153, 1161 (10th Cir. 2011).  We need not torture "the language of the statute when a simple, straightforward reading obviates the necessity of making such semantic contortions."  Equal Emp't Opportunity Comm'n v. Louisville N. R.R. Co., 505 F.2d 610, 619-20 (5th Cir. 1974); see also Resolution Tr. Corp. v. Fed. Sav. and Loan Ins. Corp., 25 F.3d 1493, 1500 (10th Cir. 1994).  The word "user" in the DMCA is straightforward and unambiguous.  Simply put, a "user" is "one that uses."

Merriam-Webster's Collegiate Dictionary 1297 (10th ed. 2001). In the DMCA context, we agree with the district court that the term "'user' describes a person or entity who avails itself of the service provider's system or network to store material." BWP Media USA Inc., 2015 WL 1538366 at *6. We note that opinions interpreting the DMCA's safe harbor provisions have not exhaustively defined the term, suggesting apparent clarity. See, e.g., UMG Recordings, Inc. v. Shelter Capital Partners LLC, 718 F.3d 1006, 1015-20 (9th Cir. 2013); Viacom Int'l, Inc., 676 F.3d at 38-40; Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1117-18 (9th Cir. 2007).

In an effort to narrow the word "user," BWP suggests the ordinary meaning of the term would protect every ISP from liability for copyright infringement. See Aplt. Br. at 17. BWP has offered several alternative definitions of "user" – at one point suggesting "user" should exclude an ISP's owners, employees, and agents, at another point suggesting "user" should exclude anyone who entered into a contract and received compensation from an ISP.

Putting aside, for a moment, that BWP offers no legal authority to support either definition, we need not look far to reject the argument that a plain language definition of "user" will protect every ISP from liability for copyright infringement.[5] The term "user" cannot be read in isolation, it must be read in

---

[5] BWP relies upon three cases ostensibly supporting its definition of "user" as excluding employees, agents, or owners. But none of the cases analyze or

-7-

conjunction with the remainder of the safe harbor provision. See King v. Burwell, 135 S. Ct. 2480, 2489 (2015).  Safe harbor protection is conditioned on various factors: An ISP will only qualify for safe harbor protection when it can show, inter alia, that the content was stored at the direction of a "user," that the ISP had no actual knowledge of the infringement, that there were no surrounding facts or circumstances making the infringement apparent, or that upon learning of the infringement, the ISP acted expeditiously to remove or disable access to the infringing material.  See 17 U.S.C. § 512(c)(1)(A).

BWP also argues that Examiners are agents of AXS and therefore not "users."  No evidence supports the notion that the Examiners are agents.  Thus, the argument is contrary to the language of the contract, our interpretation of the term "user," and agency principles generally.  As previously stated, a "user" is anyone who uses a website — no class of individuals is inherently excluded. Moreover, the Examiners are not agents – the contract language explicitly designates Examiners as independent contractors: "You will provide the Services

---

support the suggested definition of "users."  See UMG Recording, Inc. v. Escape Media Grp., Inc., No. 11-civ-8407, 2014 WL 5089743 (S.D.N.Y. Sept. 29, 2014) (safe harbor provision never discussed or raised as an affirmative defense); Capitol Records, Inc. v. MP3tunes, LLC, 48 F. Supp. 3d 703, 714-18 (S.D.N.Y. 2014) (holding that when executives have actual knowledge of the specific instances of infringement they lose the safe harbor protection); Capitol Records, LLC v. Vimeo, LLC, 972 F. Supp. 2d 500, 518 (S.D.N.Y. 2013) (holding that the determinative consideration was whether the infringing postings were made by employees at the direction of their employer, not whether it was an employee who had posted the infringing material).

hereunder as an independent contractor and not as the agent, employee, legal representative, partner, or joint venturer of Examiner.com." J.A. 138. We may rightfully consider that language. United States v. New Mexico, 581 F.2d 803, 808 (10th Cir. 1978).

Finally, BWP argues that even if there is no actual agency relationship, the Examiners had apparent authority and therefore should be considered employees of AXS under Community for Creative Non-Violence v. Reid, 490 U.S. 730, 741 (1989). There are numerous reasons to reject this argument. First, evidentiary insufficiency. As the district court noted, we lack evidence of an agency relationship or any apparent authority. See Restatement (Third) of Agency § 3.03 cmt. b (Am. Law. Inst. (2015)) ("[A]n agent's apparent authority originates with expressive conduct by the principal toward a third party . . . [t]he fact that one party performs a service that facilitates the other's business does not constitute such a manifestation.").

Second, even if the Examiners have apparent authority, and they do not, this does not equate to an employee-employer relationship under Reid. 490 U.S. at 741. In Reid, the Supreme Court analyzed an oral agreement between two parties and at one point in its analysis recognized that because "Congress intended terms such as 'employee,' 'employer,' and 'scope of employment' to be understood in light of agency law, we have relied on the general common law of agency, rather than on the law of any particular State, to give meaning to these

-9-

terms." Id. at 740. While BWP correctly identifies that Reid involves an analysis of copyright law generally and that Reid dealt minimally with agency law issues, nowhere in Reid is there anything to support the assertion that apparent authority would automatically transform an agent into an employee. Aplt. Br. at 42.

Third, as previously discussed, simply because someone is an employee does not automatically disqualify him as a "user" under § 512. Therefore, even if we were to ignore the contract language and accept both of BWP's flawed legal assertions — AXS would still not be automatically disqualified from the safe harbor.

2. The infringing material was not stored at the direction of AXS.

The key to limiting the safe harbor provision and preventing the creation of the "lawless no-man's-land," Aplt. Br. at 17, is to look to the language constraining the word "user." The relevant question isn't who is the "user," but rather, who directed the storage of the infringing content? See 17 U.S.C. § 512(c)(1). Key to this provision is control. There is no protection under § 512 when the infringing material is on the system or network as a result of the ISP's "own acts or decisions." H.R. Rep. No. 105-551, pt.2, at 53 (1998). When an ISP "actively encourag[es] infringement, by urging [its] users to both upload and download particular copyrighted works," it will not reap the benefits of § 512's safe harbor. Columbia Pictures Indus., Inc. v. Fung, 710 F.3d 1020, 1043 (9th Cir. 2013). However, if the infringing content has merely gone through a

-10-

screening or automated process, the ISP will generally benefit from the safe harbor's protection. See, e.g., Shelter Capital Partners LLC, 718 F.3d at 1020; IO Grp., Inc. v. Veoh Networks, Inc., 586 F. Supp. 2d 1132, 1146-48 (N.D. Cal. 2008); CoStar Grp., Inc. v. LoopNet, Inc., 164 F. Supp. 2d 688, 701-02 (D. Md. 2001), aff'd, 373 F.3d 544 (4th Cir. 2004).

BWP argues that even if Examiners are "users," AXS cannot rely upon the safe harbor because it directed the Examiners to post the infringing content. According to BWP, AXS created this control by issuing instructions on the general topics Examiners were to write about, actively soliciting new articles, and suggesting that Examiners include slide shows or pictures to accompany articles. BWP, however, fails to explain how this evidence crosses the chasm between encouraging the Examiners to post pictures with articles and encouraging Examiners to post infringing content. Not only did AXS make clear copyright infringement was prohibited, it also provided Examiners with licensed photographs to accompany their articles. No reasonable trier of fact could find that the infringement was at the direction of AXS.

3. AXS did not have actual or circumstantial knowledge of the copyright infringement and therefore, is not disqualified from safe harbor protection.

Because AXS cleared the initial hurdle requiring the content be stored at the direction of a "user," the next step is to determine whether AXS has been disqualified from the safe harbor by any of the subsequent provisions. Relevant

to this case, if the ISP has actual or circumstantial knowledge of the infringing activity, it does not qualify for safe harbor protection. See 17 U.S.C. § 512(c)(1)(A)(i)-(ii).

        a.      AXS was not willfully blind to the infringement and therefore cannot be said to have actual or circumstantial knowledge of the infringement.

Because photographs of celebrities are typically protected by copyright and AXS knew celebrity images were being posted on Examiner.com, BWP asserts that AXS was willfully blind to the copyright infringement. BWP argues that "by requiring Examiners to post (specific) content to the Website (periodically under threat of termination), Defendant engages in precisely the kind of purposeful conduct that brought about the infringement." Aplt. Br. at 36. This statement is contrary to both the evidence in the record and cases interpreting the DMCA. As previously stated, there is nothing in the record showing that AXS encouraged the Examiners to post infringing material. There is also nothing in the record showing that AXS ignored signs or circumstances suggesting copyright infringement was occurring on Examiner.com. Although BWP is correct in stating AXS encouraged Examiners to incorporate photographs into articles, AXS provided Examiners a legal means by which to accomplish this. Examiners have access to a photo bank full of images for which AXS owns the licenses. Prior cases also clearly establish that "merely hosting a category of copyrightable content, such as music videos, with the general knowledge that one's services

-12-

could be used to share infringing material, is insufficient to meet the actual knowledge requirement under § 512(c)(1)(A)(i)." Shelter Capital Partners LLC, 718 F.3d at 1022-23 ("For the same reasons, we hold that [an ISP's] general knowledge that it hosted copyrightable material and that its services could be used for infringement is insufficient to constitute a red flag.").

      b.      Agency principles cannot be used to impute the Examiners' knowledge to AXS.

In a final attempt to impose liability on AXS, BWP argues, for the first time, that the safe harbor provision is inapplicable because agency principles would impute the Examiner's knowledge onto AXS, making it liable for their actions. We require that "[f]or each issue raised on appeal, all briefs must cite the precise reference in the record where the issue was raised and ruled on." 10th Cir. R. 28.2(C)(2). BWP's briefs fail to show where the argument of imputed knowledge was raised and ruled upon below and therefore, this argument is waived.[6] See, e.g., ClearOne Commc'ns, Inc. v. Bowers, 651 F.3d 1200, 1213 (10th Cir. 2011).

      AFFIRMED.

---

[6] Moreover, despite BWP's statement at oral argument that this issue was fully briefed in a memorandum of law, our review of the record suggests otherwise.