RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0161p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

OHIO DEPARTMENT OF MEDICAID,

*Petitioner,*

*v.*

THOMAS E. PRICE, Secretary of Health and Human Services,

*Respondent.*

No. 16-3550

---

On Petition for Review of a Final Determination
of the Secretary of Health and Human Services
No. 15-01.

Argued: January 26, 2017

Decided and Filed: July 24, 2017

Before: GUY, CLAY, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Ara Mekhjian, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Petitioner. Lucy C. Lisiecki, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Chicago, Illinois, for Respondent. **ON BRIEF:** Ara Mekhjian, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Petitioner. Lucy C. Lisiecki, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Chicago, Illinois, for Respondent.

GRIFFIN, J., delivered the opinion of the court in which GUY, J., joined. CLAY, J. (pp. 17–31), delivered a separate dissenting opinion.

---

**OPINION**

---

GRIFFIN, Circuit Judge.    The Ohio Department of Medicaid petitions this court for review of an order entered by the Centers for Medicare and Medicaid Services (CMS) denying a proposed amendment to the State's Medicaid plan.  At issue is whether Ohio's juvenile pretrial detainees are "inmate[s] of a public institution"—a population ineligible for federal Medicaid reimbursement under 42 U.S.C. § 1396d(a)(29)(A).  CMS has determined they are.  Because the agency's interpretation is not arbitrary, capricious, or an abuse of its discretion, we deny the petition for review.

I.

A.

Medicaid is a cooperative federal-state program that provides funds to participating states for the medical care of needy individuals.  *Harris v. Olszewski*, 442 F.3d 456, 460 (6th Cir. 2006).  To qualify for federal funds, states must submit to CMS "a state Medicaid plan that details the nature and scope of the State's Medicaid program.  It must also submit any amendments to the plan that it may make from time to time."  *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 610 (2012).  Before approving a state's plan or an amendment to it, CMS reviews the plan for compliance with all statutory and regulatory requirements.  *See Rosen v. Goetz*, 410 F.3d 919, 927 (6th Cir. 2005); *see also* 42 U.S.C. §§ 1316(a)(1), (b) & 1396a(b).  "And . . . the agency will not provide federal funds for any state plan amendment until the agency approves the amendment."  *Douglas*, 565 U.S. at 611.

One constraint on state plans is Medicaid's inmate exclusion, which prohibits federal financial participation (FFP) for state medical expenditures made on behalf of "any individual who is an inmate of a public institution (except as a patient in a medical institution)."  42 U.S.C. § 1396d(a)(29)(A).[1]    State governments are traditionally responsible for the medical care of

---

[1]Under 42 U.S.C. § 1396a(a)(10)(A), a state's plan must provide "for making medical assistance available, including at least the care and services" listed in § 1396d(a).  Section 1396d(a) defines "medical assistance" as

those they punish by incarceration. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *see also Brown v. Plata*, 563 U.S. 493, 510–11 (2011). And "[t]he intent of [this] prohibition is to ensure that federal Medicaid funds are not used to finance care that is the responsibility of state and local authorities." Carolyn L. Yocom, U.S. Gov't Accountability Off., GAO-14-752R Medicaid: Information on Inmate Eligibility and Federal Costs for Allowable Services (2014) (footnote omitted).

CMS defines who is, and who is not, an "inmate of a public institution" in 42 C.F.R. § 435.1010. The regulation provides in pertinent part:

> Inmate of a public institution means a person who is living in a public institution. An individual is *not considered an inmate* if—
>
> * * *
>
> (b) He is in a public institution for a temporary period pending other arrangements appropriate to his needs.

*Id.* (emphasis added). An individual is an "inmate of a public institution" barred from coverage if he "is living in a public institution." *Id.* However, an individual living in a public institution is *not* an "inmate of a public institution"—and therefore *not* barred from coverage—if he resides in the public institution "for a temporary period pending other arrangements appropriate to his needs." *Id.*

### B.

In early 2014, Ohio submitted a proposed plan amendment to CMS aimed at exploiting this distinction. Specifically, it sought to classify pretrial detainees under age 19 as non-inmates—i.e., those who live in a public institution for only "a temporary period pending other arrangements appropriate to [their] needs," and for whom the State can claim federal Medicaid reimbursement. In so doing, petitioner acknowledged it was "requesting . . . Medicaid coverage for a specific population that is currently ineligible for Medicaid benefits."

---

"payment of part or all of the cost" of certain types of care, but specifically excludes "any such payments with respect to care or services for any individual who is an inmate of a public institution (except as a patient in a medical institution)." 42 U.S.C. § 1396d(a)(29)(A).

After requesting and receiving further information from Ohio, CMS denied the amendment. Respondent explained that the inmate exclusion recognizes "no difference" between adults and juveniles, or convicted detainees and those awaiting trial. "For purposes of excluding FFP, for example, a juvenile awaiting trial in a detention center is no different than an adult in a maximum security prison," "both are considered inmates of a public institution." It also rejected Ohio's argument that juvenile pretrial detainees fit the regulatory exception for individuals living in a public institution for a "temporary period," and instead emphasized that the involuntary nature of the stay is the determinative factor: "This exception . . . does not apply when the individual is involuntarily residing in a public institution awaiting adjudication of a criminal matter."

Ohio challenged the decision through a CMS hearing officer and an administrator, and both affirmed the denial. It now petitions for review of the administrator's ruling as the Secretary's final decision.

II.

The Administrative Procedure Act governs our review of the Secretary's decision. *Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 408–09 (6th Cir. 2007). "The APA, which is incorporated by the Social Security Act, *see* 42 U.S.C. § 1359*oo*(f)(1), commands reviewing courts to 'hold unlawful and set aside' agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting 5 U.S.C. § 706(A)(2)). CMS falls short of this standard if its decision "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

A.

"The Medicaid Act commits to the federal agency the power to administer a federal program." *Douglas*, 565 U.S. at 614. "And here," in denying Ohio's proposed amendment, "the

agency has acted under this grant of authority." *Id.* Section 1396a(b) of the Act directs the Secretary to approve state plans that "fulfill[] the conditions specified" in the statute, and reject those that do not. 42 U.S.C. § 1396a(b). Through this "express delegation of specific interpretive authority," *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001), "Congress manifested its intent that the Secretary's determinations, based on interpretation of the relevant statutory provisions, have the force of law." *Pharm. Research & Mfrs. of Am. v. Thompson*, 362 F.3d 817, 822 (D.C. Cir. 2004). Accordingly, we give the agency's decision to disapprove the amendment the benefit of *Chevron* deference. *See Harris*, 442 F.3d at 467, 470; *see also Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984).

"When a court reviews an agency's construction of the statute which it administers" under *Chevron*, "it is confronted with two questions." 467 U.S. at 842. "First, always," is whether "Congress has directly spoken to the *precise question at issue*." *Id.* (emphasis added). "If it has, 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Harris*, 442 F.3d at 466 (quoting *Chevron*, 467 U.S. at 842–43). Second, if Congress has not spoken to the precise question at issue, and the statute is silent or ambiguous, we ask "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. "Permissible" does not mean the agency's construction was "the only one" CMS could have adopted, or "even the reading we would have reached if the question initially had arisen in a judicial proceeding." *Battle Creek*, 498 F.3d at 408–09 (quoting *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 273–74 (6th Cir. 1994)). It means we defer to the agency's reading unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844 (footnote omitted). Because the Medicaid Act is silent regarding the precise question at issue here—whether the term "inmate" encompasses juvenile pretrial detainees—we proceed to the second step of the inquiry.

The administrator found § 1396d(a)(29)(A) "unambiguous[ly]" prohibits federal funding "for medical care of an 'inmate' . . . unless the inmate is in a medical institution." "In set[ting] forth this prohibition," he noted, "the statute does not differentiate between types of inmates, for example by age (juvenile or adult) or by status (detained or sentenced)." Nor does the term

"inmate" imply such a distinction. "[I]nmate" is "synonymous with . . . prisoner, convict, and detainee," or in other words, "a person confined to an institution." Like their adult "inmate" counterparts, juvenile pretrial detainees are "confined to an institution." "Thus," he determined that the statute treats them the same as any adult "prisoner, convict or detainee"—it precludes federal funding for their care. This construction is permissible.

1.

First and foremost, it accords with the plain language of § 1396d(a)(29)(A) and the "ordinary and natural meaning" of "inmate." *Harris*, 442 F.3d at 466 (brackets and citation omitted). "In determining a term's ordinary meaning, dictionaries are a good place to start." *Wheaton v. McCarthy*, 800 F.3d 282, 287 (6th Cir. 2015) (brackets and citation omitted). An "inmate" is "a person confined in a prison, hospital, or similar institution"—with "confined" being the operative word. *Inmate*, Black's Law Dictionary 908 (10th ed. 2009). "Prisoner; inmate; confinee . . . . These terms all denote one who is deprived of liberty and held in custody." *See* Garner's Dictionary of Legal Usage 708–09, 459 (3d ed. 2011) (directing readers to "prisoner" in order to define the term "inmate"). This "ordinary meaning" does not differentiate by age or conviction status, *Wheaton*, 800 F.3d at 287, and neither did Congress in drafting the exclusion. Whether juvenile or adult, pretrial detainees fit this definition; they are "confined," "deprived of liberty," and "held in custody."

Even so, Ohio argues "it would be a mistake to import significance" to Congress's "failure to distinguish between adults and children," because at the time of Medicaid's 1965 enactment, "it was self-evident" that the law treated juveniles differently, affording them fewer rights than those granted to adults facing criminal charges.[2] We think it more "self-evident" that when Congress intends to apply an age-based distinction, it drafts one. In other subsections of § 1396d, it did just that. *See* 42 U.S.C. §§ 1396d(a)(i), (iii), & (v) (referring to individuals "under the age of 21," "65 years of age or older," and "18 years of age or older"); *id.* at § 1396d(h) ("Inpatient psychiatric hospital services for individuals under age 21"); *id.* at § 1396d(w)(1)(A) (defining an "independent foster care adolescent" as an individual who is

---

[2]Petitioner does not explain how the scope of a juvenile's rights in a criminal proceeding relates to the federal government's alleged obligation to finance his medical care.

"under 21 years of age"). Had it intended a similar age-based distinction for the inmate exclusion, "Congress, we take it, would have included a similar direction in that section." *E.P.A. v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1601 (2014). However, it did not. *See Jama v. Immigration and Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."). Congress instead gave the exclusion a broad reach, precluding "*any such payments* with respect to care or services for *any individual* who is an inmate of a public institution"—and permitting an exception for reimbursement based not on age, but on location of the service, i.e., when the inmate is "a patient of a medical institution." 42 U.S.C. § 1396d(a)(29)(A) (emphasis added, parenthesis omitted).

Ohio alternatively suggests that if the text of § 1396d(a)(29)(A) does not include an exception for juvenile pretrial detainees, we may opt to ignore it. To petitioner, the statutory inmate exclusion is "not [even] at issue" here "because CMS has created regulations implementing that statute" in 42 C.F.R. § 435.1010—the regulation that defines "inmate" and sets forth the "temporary period" exception upon which petitioner relies. Ohio insists it is "[t]hose regulations," and "not the Medicaid Act" that ought to "control [the] availability of FFP in this case."

We agree the regulation is central to the petition for review; but not to the exclusion of the statute. Ohio seems to believe its chances at Medicaid reimbursement are better under the regulation penned by CMS than the statute penned by Congress. But if that were the case, it would not mean petitioner's amendment should be approved—it would mean CMS's regulation is overbroad. "Agencies," after all, "are creatures of statutory authority." *Friends of Crystal River v. E.P.A.*, 35 F.3d 1073, 1080 (6th Cir. 1994). They "may not confer power upon [themselves]," and have "literally no power to act . . . unless and until Congress confers power upon [them]." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986). And agency "regulations, in order to be valid, must be consistent with the statute under which they are promulgated." *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1334 (2013) (quoting *United States v. Larionoff*, 431 U.S. 864, 873 (1977)). CMS is free to adopt regulations in order to fill

legislative gaps or resolve ambiguities. *See Chevron*, 467 U.S. at 843–44; *see also Mead*, 533 U.S. at 229. But it cannot "override Congress" with a regulation permitting broader coverage than the Medicaid Act itself. *La. Pub. Serv. Comm'n*, 476 U.S. at 375. Neither can we in interpreting Congress's language—our "task is to apply the text of the statute, not improve upon it." *EME Homer City Generation*, 134 S. Ct. at 1600 (citation and brackets omitted).

2.

The administrator's interpretation is also consistent with the statute's legislative history, which reflects a Congressional judgment that Medicaid should not fund "items and services which are paid for directly or indirectly by [another] governmental entity," such as the states. S. Rep. 89-404, 1965 U.S.C.C.A.N. 1943, 1989 (June 30, 1965); *see also* Medicaid Program; Federal Financial Participation for Inmates in Public Institutions and Individuals in an Institution for Mental Disease or Tuberculosis, 50 Fed. Reg. 13196-01, 13196 (April 3, 1985) (codified at 42 C.F.R. pts. 435 & 436) ("The intent of this provision is to ensure that Medicaid funds are not used to finance care which traditionally has been the responsibility of State and local governments."). Requiring states to pay for some of the care they traditionally provide is not unreasonable "in the context of a federal statute that relies on state and federal cooperation (and state and federal money)." *Harris*, 442 F.3d at 468.

Ohio acknowledges that Medicaid is not intended to "supplant[]" its obligation to provide its prisoners medical care. For juveniles, however, petitioner argues it "does not have that obligation . . . in the first instance" thanks to Ohio Revised Code § 2151.36. Section 2151.36 requires juvenile courts to order a child's parents or guardians to "pay for the care, support, maintenance and education of the child" while in state custody. *Id.* Ohio therefore reasons that "[a]t most," CMS "might be supplanting a parent's obligation" to provide for a juvenile detainee's care, not the state's obligation. And supplanting a parent's obligation is what CMS does "any time it provides FFP for services . . . to a minor," so there is no harm in granting the state's proposed amendment here.

But a statute that shifts an expense to parents is not a license to further shift that expense to the federal government. Parents "[u]nquestionably" have a duty to provide for their children's

medical care when they are financially "*able*" to do so. *In re J.J.*, 582 N.E.2d 1138, 1141 (Ohio Ct. App. 1990) (per curiam) (emphasis in original). However, parents of children eligible for Medicaid are not able to do so. In that circumstance, § 2151.36 provides that the cost of juvenile detainee medical care "shall be paid from the county treasury."[3] Ohio Rev. Code § 2151.36; *see e.g., In re Hoodlet*, 593 N.E.2d 478, 481–82 (Ohio Ct. App. 1991). Ultimately then, Ohio's proposed amendment does not merely "supplant[]" a parent's obligation. It does just what Congress sought to avoid: allocate "Medicaid funds . . . to finance care which traditionally has been the responsibility of State and local governments." 50 Fed. Reg. at 13196.

### B.

Another problem with Ohio's regulation-trumps-the-statute theory is that it presupposes its own conclusion; it assumes the regulation is, in fact, more expansive than the statute. *Compare* 42 U.S.C. § 1396d(a)(29)(A) *with* 42 C.F.R. § 435.1010. We conclude it is not.

### 1.

Before reviewing the administrator's construction of § 435.1010, we must decide as a threshold matter whether the regulation is ambiguous. If it is, Ohio faces an uphill climb. "The deference accorded to an agency's interpretation of its own ambiguous regulation is substantial and afforded even greater consideration than the *Chevron* deference accorded to an interpretation of an ambiguous statute." *Thornton v. Graphic Commc'ns Conference of Int'l Bhd. of Teamsters Supplemental Ret. and Disability Fund*, 566 F.3d 597, 611 (6th Cir. 2009). We give CMS's interpretation "controlling" weight unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citation omitted). If the regulation is not ambiguous, we forego deference and apply the plain language of the regulation as written. *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000).

---

[3]County treasuries are not responsible for "the part of the expense that may be paid by the state or federal government." Ohio Rev. Code § 2151.36. Of course, the source of those federal funds does not presently include the Medicaid program.

Section 435.1010 provides in pertinent part:

Inmate of a public institution means a person who is living in a public institution. An individual is not considered an inmate if—

(a) He is in a public educational or vocational training institution for purposes of securing education or vocational training; or

(b) He is in a public institution for a temporary period pending other arrangements appropriate to his needs.

* * *

Public institution means an institution that is the responsibility of a governmental unit or over which a governmental unit exercises administrative control. The term "public institution" does not include— . . . A medical institution . . . ; A publicly operated community residence . . . ; or A child-care institution.

42 C.F.R. § 435.1010. A regulation is ambiguous when its meaning is "not free from doubt," *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150 (1991), and its language "compel[s]" no particular interpretation, *Thomas Jefferson Univ.*, 512 U.S. at 512. Considered in isolation, subsection (b) may inspire some doubt over whether juvenile pretrial detainees are barred from Medicaid coverage—especially since their living status is "temporary" pending the results of adjudication. *See* Ohio Rev. Code § 2151.011(B)(13) ("'Detention' means the temporary care of children pending court adjudication or disposition . . ."). Given that § 435.1010 is arguably ambiguous as applied to the population at issue here, we afford the Secretary's interpretation *Auer* deference.

2.

Ohio maintained before the administrator that juvenile pretrial detainees are not inmates within the meaning of the statute or the regulation because the state holds them "in a public institution only until the[ir] case[s] [are] resolved" and the court makes "other . . . arrangements" for their care. But this reasoning, the administrator explained, "erroneously elevates the 'temporary'" nature of the stay above the involuntary nature of the detention—which he viewed as the deciding factor for eligibility. "The involuntary nature of the stay is characteristic of a 'prisoner' or 'detainee' or, in short, a word that covers both the sentenced individual and pretrial

detainees, an inmate." Juvenile pretrial detainees are confined involuntarily, and, therefore, he found, they are "inmate[s]."

Ohio argues the administrator's ruling was in error because there is no express voluntariness requirement in § 435.1010. True enough. But the *concept* of voluntariness is expressed throughout the regulation. The word "inmate," which appears in both the statute and the regulation, is the most obvious example. Again, "inmate" ordinarily "denote[s] one who is deprived of liberty and held in custody." *See* Garner's Dictionary of Legal Usage, at 708–09. This commonly understood definition of "inmate" "comfortably bears the meaning the Secretary assigns"; an individual subject to involuntary confinement. *See Auer*, 519 U.S. at 461 (consulting dictionaries to assess the validity of the agency's interpretation of its own regulations). Exclusions within the regulation also support the agency's reading. Subsection (a), for instance, specifies that an individual who "is in a public educational or vocational training institution for the purposes of securing education or vocational training" is not an inmate, 42 C.F.R. § 435.1010. This is so because, as CMS explains, "an individual who seeks [such] training . . . is free to leave at any time."

The definition of "public institution," where "inmates" reside, is another example. A "public institution" *does not include* facilities known as "publicly operated community residence[s]." 42 C.F.R. § 435.1010. A "publicly operated community residence," in turn, is a residence providing "some services beyond food and shelter such as social services, help with personal living activities, or training in socialization and life skills," but "*does not include . . .* [c]orrectional or holding facilities for individuals who are prisoners, have been arrested or detained pending disposition of charges, or are held under court order as material witnesses or juveniles"—i.e., pretrial detainees. *Id.* (emphasis added). However awkwardly written, the double negative employed here—excluding the term "publicly operated community residences" from "public institutions," and excluding pretrial detainees from "publicly operated community residences"—conveys that pretrial detainees are indeed among the "inmates" who live in public institutions.

The same is true for "child-care institutions." "Public institutions" exclude "child-care institutions," and "child-care institutions" likewise "do[] not include detention facilities" or "any

other facility operated primarily for the detention of children who are determined to be delinquent." 42 C.F.R. § 435.1010.  Here, too, the double-negative grammatical scheme conveys that "delinquent" children housed in "detention facilities" are not considered to be residing in "child-care institutions."  Rather, they are "inmates" residing in "public institutions" on whose behalf the state may not claim Medicaid funds.

Whereas CMS's interpretation compliments the regulation's language, Ohio's interpretation proposes to change it.  The state plan amendment petitioner submitted to CMS essentially copies § 435.1010(b) with the addition of the italicized language:

> Individuals are not considered inmates if they are in a public institution for a temporary period pending other arrangements appropriate to their needs, *including individuals under age 19 in detention who have not been adjudicated* and are there for a temporary period pending other arrangements appropriate to their needs.

(Italic emphasis added.)  A person held in pretrial detention may be there for only a "temporary period," but "temporary period" (as used in the original § 435.1010) is modified by "pending other arrangements appropriate to their needs."  42 C.F.R. § 435.1010.  If that exclusionary language already fits the class of persons for whom Ohio seeks federal funds, then the state's proposed amendment is unnecessary.  By explicitly referring to "individuals under 19 . . . who have not been adjudicated," Ohio all but admits that the regulation as written must not include this population.  Finding the Secretary's denial arbitrary, capricious, or "otherwise not in accordance with law" is difficult when, even under Ohio's construction, the regulation would have to be changed in order to accommodate its request. *See* 5 U.S.C. § 706(2)(A).

Although the foregoing counsels in favor of deference to the Secretary, there are exceptions to the general *Auer* rule, and petitioner claims this is an exceptional case.  Deferring to the agency's reading is inappropriate, for example, if its interpretation is "inconsistent with the regulation." *Auer*, 519 U.S. at 461.  Ohio argues that considering voluntariness is inconsistent with § 435.1010 at least when it comes to minors, a point illustrated by CMS's policy regarding children in foster care who are indisputably not "inmates."  According to petitioner, "CMS maintains that a child in the State's custody who is temporarily placed in foster care is not an inmate of a public institution because he is there 'voluntarily,' even though . . . a child in state-

ordered foster care is legally compelled to remain in foster care and is not permitted to choose to return home." The state therefore concludes CMS's interpretation is inconsistent—it permits FFP for some children held involuntarily in the state's custody (children awaiting foster care placement) but not others (juvenile pretrial detainees). "For that matter," adds Ohio, the voluntary-involuntary dichotomy is inapposite for minors because, unlike adults, "children are not anywhere voluntarily."[4] Petitioner is doubly mistaken.

For one, Ohio's premise is faulty. Children in state custody for foster care purposes are excluded from the definition of "inmate[s]" not because their stay is deemed voluntary, but because they do not reside in "public institutions."[5] For another, so is its broader implication. The fact that adults and juveniles enjoy different legal rights outside of the detention setting does not mean that CMS must maintain separate rules for each group.[6] There is no "basis for suggesting that the Secretary has a statutory duty to promulgate regulations that, either by default rule or by speculation, address every conceivable question in the process of determining equitable reimbursement" to the states. *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 96 (1995). What cannot be accounted for in regulations may be resolved in court, as Ohio has shown here. *See id.* ("The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than adjudication.").

Deferring to the agency's interpretation is also inappropriate where it is merely a "'*post hoc* rationalization' advanced by an agency seeking to defend past agency action against attack[.]" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (quoting *Auer*, 519 U.S. at 462). The dissent argues that CMS has adopted its present interpretation of § 435.1010(b) as a "'convenient litigating position,'" *id*. (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988)), and it is therefore not entitled to *Auer* deference.

---

[4]Ohio forgets that the adults in this case "are not anywhere voluntarily" either. They are involuntarily confined to state custody pending trial.

[5]Again, "child-care institution[s]" that house children "for whom foster care maintenance payments are made under title IV-E of the Act," and children "receiving [Aid to Families with Dependent Children]—foster care under title IV-A of the Act," are not "public institutions." 42 C.F.R. § 435.1010. Because these children are not "living in a public institution," they are not inmates.

[6]The foregoing discussion regarding the exclusions applicable to "publicly operated community residences" and "child-care institutions" demonstrates that even when the regulation refers to adult or juvenile inmates separately, it treats them the same for eligibility purposes.

The record belies the dissent's argument. A 1997 CMS memorandum that sought to "clarify the Medicaid coverage policy for inmates in a public institution" states that the public institution exception "does not apply when the individual is involuntarily residing in a public institution awaiting criminal proceedings, penal dispositions, or other involuntary detainment determinations." The 1997 memorandum also states, consistent with CMS's present argument, that "An individual is an inmate when serving time for a criminal offense or *confined involuntarily* in State or Federal prisons, jails, detention facilities, or other *penal facilities*." (Emphasis added.) It further clarifies that "For purposes of excluding FFP, for example, a juvenile awaiting trial in a detention center is no different than an adult in a maximum security prison." Contrary to the dissent's view, CMS's present interpretation is consistent with its longstanding position and is therefore entitled to *Auer* deference.

3.

That § 435.1010 does not distinguish between adults and children is one of the reasons we decline to follow the Maryland Court of Appeals' decision in *Brown v. Cty. Comm'rs of Carroll Cty.*, 658 A.2d 255 (1995). Ohio reads *Brown* as "hold[ing] that individuals in custody awaiting trial are not 'inmates of a public institution'" under the federal regulation. We read it differently.

The question in *Brown* was "whether an indigent pretrial detainee may be held personally liable for the costs of medical treatment [he] received while incarcerated, despite the fact that he may have been covered under [Maryland's Medicaid program] for most of the period of his detention." *Id.* at 257. Maryland's state eligibility rules incorporated the federal definition of "inmate of a public institution," and made pretrial detainees "responsible for reimbursing the county or State . . . for the payment of all medical care" they received while awaiting trial. *Id.* at 258–59. Upon discharging Brown, Carroll County sued him for medical costs without first seeking reimbursement through the state's Medicaid program. *Id.* at 257–58. Maryland's highest court rejected this strategy, but kept its holding decidedly narrow: "we hold that . . . in the absence of [a] clear indication that pretrial detainees are ineligible for [Medicaid] coverage under federal law, the County should first have attempted to seek reimbursement" through Medicaid before attempting to hold the indigent plaintiff personally liable. *Id.* at 264.

Ohio believes *Brown* demonstrates "that FFP is available for services provided to pretrial detainees." We disagree. Petitioner here may challenge the same language considered in *Brown*, but that is where the similarities end. First, this case involves an interpretation of *both* the statutory inmate exclusion (which the majority in *Brown* did not address) and its accompanying regulation. Second, unlike the Maryland Court of Appeals, we may not review either provision de novo. We defer to CMS's denial of Ohio's state plan amendment so long as its statutory construction is permissible, *see Harris*, 442 F.3d at 467, and its regulatory interpretation is not "plainly erroneous," *Auer*, 519 U.S. at 461 (citation omitted). Third, the *Brown* court did not consider those portions of the federal regulation supporting the Secretary's use of voluntariness as the dividing line for eligibility. Nor, evidently, did it have the benefit of any interpretive guidance from CMS. *See Brown*, 658 A.2d at 260, 262 ("We have found no authority to support the Attorney General's contention that [the 'temporary period' exception] is not intended to be applicable to pretrial detainees."). In fact, the majority explicitly conditioned the County's duty to seek state benefits before suing Brown on "the absence of [a] clear indication that pretrial detainees are ineligible for [Medicaid] coverage under federal law." *Id.* at 264. Here, we have every "clear indication" that they are.

Yet, even setting those issues aside, we are left with the troublesome fact that *Brown* concerned an *adult* pretrial detainee. Ohio may, for the moment, seek Medicaid funds only for its juvenile pretrial detainee population. But as petitioner's counsel conceded at oral argument, if juvenile pretrial detainees are living "in a public institution for a temporary period pending other arrangements appropriate to [their] needs," then adult pretrial detainees must also be living "in a public institution for a temporary period pending other arrangements appropriate to [their] needs," 42 C.F.R. § 435.1010, permitting petitioner (and all other participating states) to claim federal funds on behalf of both groups. This outcome is contrary to forty-plus years of agency policy consistently denying Medicaid reimbursement for the care of pretrial detainees.[7] Ohio has

---

[7]In this regard, we reject petitioner's claim that CMS has applied the regulation inconsistently; if anything, the evidence Ohio submitted proves the opposite. For instance, the 1997 letter CMS directed to its regional offices explained that "a juvenile awaiting trial in a detention center is no different than an adult in a maximum security prison," "both are inmates of a public institution" barred from coverage. The agency's former practice of providing federal funds for the first and last months of an inmate's incarceration likewise does not show inconsistency, as that was "a policy of administrative convenience," "not a statutory requirement." *See* 50 Fed. Reg. at 13196. Petitioner also points to a Regional Commissioner's 1973 statement indicating that juveniles are inmates "irrespective of

given us no reason to question the Secretary's informed judgment in continuing that policy. *See Harris*, 442 F.3d at 468 ("Reliance on the Secretary's significant expertise is also particularly appropriate in the context of a complex and highly regulated program like Medicaid." (internal quotation marks and brackets omitted)).

### III.

We find the Secretary's construction of the statute "permissible," *Chevron*, 467 U.S. at 843, and his interpretation of the regulation "controlling," *Auer*, 519 U.S. at 461. His decision does not "rel[y] on factors which Congress has not intended [him] to consider, entirely fail[] to consider an important aspect of the problem," or offer "an explanation . . . that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. Nor is it "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* It is not arbitrary, capricious, or an abuse of his discretion. Accordingly, we deny the petition for review.

---

whether [they] . . . are detained by legal process." Insofar as this statement can be read to support petitioner, and insofar as CMS is bound by an ambiguous 44-year-old remark, "the agency is entitled to change its view" so long as it "explain[s] its reasons for doing so." *State Farm*, 463 U.S. at 56. CMS did just that. Its 1997 letter recognized a need to "refine our coverage policy in this area," and clarified that "there is no difference" in the application of the inmate exclusion to juveniles and adults.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.  In this petition for review, the Ohio Department of Medicaid ("Ohio") asks us to require the Secretary of Health and Human Services ("the Secretary") to follow his department's own published regulations and grant federal Medicaid funds for Ohio's juvenile pretrial detainees, a class of persons living "in a public institution for a temporary period pending other arrangements appropriate to [their] needs."  42 C.F.R. § 435.1010(b).  The Secretary rejected Ohio's request because juvenile pretrial detainees do not "voluntarily" reside in a public institution, even though this "voluntariness" requirement does not appear in either the Medicaid Act ("the Act") or the Secretary's regulations, and conflicts with the Secretary's own interpretation of § 435.1010(b).

In granting agency deference to the Secretary's confused and internally contradictory decision and rationale, the majority commits several serious legal errors that threaten to undermine the public's ability to hold federal agencies to their own regulations.  Because I do not believe that *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and its progeny either require or permit the unwarranted expansion of administrative deference effectuated by the majority's opinion, I respectfully dissent.

I.      **The Secretary's Position Should Not Receive Administrative Deference**

The majority first goes astray by permitting the Secretary to ground his denial of Ohio's Medicaid funding request in his interpretation of the Medicaid Act, even though the Secretary has already promulgated regulations that comprehensively interpret the Act's relevant provisions—regulations that ostensibly carry the force of law.  In so doing, the majority effectively permits the Secretary to ignore his regulations whenever they are inconvenient, sending a troubling signal that while states and the public must obey federal regulations, the regulators themselves are not so bound.

**A.      *Chevron* Deference**

A typical *Chevron* case presents the following scenario: an administrative agency takes an adverse action against a plaintiff based on its interpretation of its authorizing statute, and the plaintiff petitions for review of that decision, arguing that the agency's interpretation was not a permissible construction of the statute.   In most cases, we defer to the agency's statutory interpretation, because the agency is ordinarily considered to be better situated than a federal court to weigh the competing policy concerns animating the statute and fill any regulatory gaps left by Congress.  *See Chevron*, 467 U.S. at 844 (The "principle of deference to administrative interpretations . . . has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations."  (citation and internal quotation marks omitted)).   However, as explained below, this case differs from an ordinary *Chevron* case in key respects that counsel against applying the doctrine here.

"The Medicaid program was established in 1965 in Title XIX of the [Social Security] Act 'for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons.'"  *Schweiker v. Hogan*, 457 U.S. 569, 571 (1982) (quoting *Harris v. McRae*, 448 U.S. 297, 301 (1980)).   For purposes that are relevant here, the Medicaid Act requires that this federal financial assistance be provided with respect to all persons receiving state Medicaid benefits, *see* 42 U.S.C. § 1396a(a)(10)(A), except that such funds are not available "with respect to care or services for any individual who is an inmate of a public institution (except as a patient in a medical institution)."  *Id.* § 1396d(a)(29)(A) ("the inmate exclusion provision").

The Act does not define which persons qualify as "inmate[s] of a public institution."   The Act does, however, vest the Department of Health and Human Services with the authority to interpret its provisions and promulgate regulations carrying the force of law.  *See, e.g., Douglas v. Independent Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 615 (2012).   Thus, ordinarily, we would be required to defer to the Secretary's interpretation of the inmate exclusion provision as long it

was not flatly contradicted by the Act's text, and was otherwise reasonable.  *Chevron*, 467 U.S. at 843, 845.

However, this case deviates from a typical *Chevron* case in a crucial respect: before this dispute ever arose, the Centers for Medicare and Medicaid Services ("CMS"), the sub-division of the Department of Health and Human Services that administers the Medicaid program, had already issued comprehensive regulations interpreting the inmate exclusion provision.  *See* 42 C.F.R. § 435.1010 (defining both "inmates" and "public institutions" and setting forth exceptions); Maj. Op. at 11–14.  Relevant here, relying on its considered judgment and policy expertise, CMS determined that Congress would not consider

An individual . . . an inmate if—

. . .

(b) He is in a public institution for a temporary period pending other arrangements appropriate to his needs.

42 C.F.R. § 435.1010(b).  Ohio has never argued that § 435.1010(b) was an unlawful or otherwise impermissible interpretation of the Act; rather, it has simply argued that its juvenile pretrial detainees are persons living "in a public institution for a temporary period pending other arrangements appropriate to [their] needs," and are thus not inmates under the Secretary's own regulations.

In his briefing before this Court, the Secretary argues that providing juvenile pretrial detainees federal Medicaid funds would be inconsistent with the text and purpose of the Medicaid Act's inmate exclusion provision, and asks us to give its interpretation *Chevron* deference.  The majority obliges.  Maj. Op. § II.A.  However, the Secretary does not seriously grapple with a critical threshold question: Why is *Chevron* applicable to this situation at all? The Secretary has already issued a binding regulatory framework defining which persons constitute "inmates" as that term is used in the Medicaid Act.  It stands to reason that our inquiry should be focused on whether juvenile pretrial detainees are "inmates" under that framework, unless the framework itself constitutes an impermissible construction of the inmate exclusion provision.  This conclusion is necessary to give the regulations legal force; after all, the

regulations are essentially meaningless if the Secretary can ignore them in making subsequent policy decisions and justify each new decision by re-interpreting the Medicaid Act.

The majority justifies sidelining § 435.1010(b) in its analysis by implying that the only permissible construction of the inmate exclusion provision is that it excludes Medicaid funds for juvenile pretrial detainees. *See* Maj. Op. at 6–7 (concluding that the plain language of the word "inmate" necessarily encompasses pretrial detainees regardless of age); *id.* at 7 (stating that if § 435.1010(b) permitted Medicaid funds for juvenile pretrial detainees, it would be "overbroad," and thus invalid). The majority thus argues that Ohio's "chances" cannot be "better" under § 435.1010(b) than they would be under the inmate exclusion provision because CMS "cannot 'override Congress' with a regulation permitting broader coverage than the Medicaid Act itself." Maj. Op. at 7–8 (quoting *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 375 (1986)).

The majority misses the point of Ohio's argument. Ohio is not arguing that § 435.1010(b) is "broader" than the inmate exclusion provision. Rather, it argues that: (i) CMS legitimately exercised the regulatory authority delegated to it by Congress to interpret "inmate[s] of a public institution" as excluding persons in "a public institution for a temporary period pending other arrangements appropriate to [their] needs;" and (ii) juvenile pretrial detainees are not "inmate[s]" as CMS has interpreted that term.

As the majority acknowledges, the inmate exclusion provision is "*silent* regarding the precise question at issue here—whether the term 'inmate' encompasses juvenile pretrial detainees[.]" Maj. Op. at 5 (emphasis added). When Congress "is silent or ambiguous with respect to [a] specific issue" in a statute, it implicitly delegates its authority to fill that regulatory gap to the administrative agency charged with implementing the statute, and courts must defer to the agency's construction as long as it does not upset the core policy priorities set forth in the statute's text. *Chevron*, 467 U.S. at 843–45. CMS exercised the authority Congress gave it to create legally binding interpretive rules when it promulgated § 435.1010(b),[1] and no party to this case has argued that this regulation exceeded the agency's authority under the Medicaid Act.

---

[1]Although I characterize § 435.1010(b) as an interpretive regulation, it is nevertheless subject to principles of administrative deference because it "directly governs the conduct" of states like Ohio, "affecting [their] rights and obligations." *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 172 (2007) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979)).

Absent any such challenge, we should presume the regulation's validity and hold the Secretary to it, rather than analyzing whether the Secretary was permitted to issue the regulation in the first place. *See Powers v. Hamilton Cty. Pub. Defender Comm'n*, 501 F.3d 592, 610 (6th Cir. 2007) ("Courts generally do not decide issues not raised by the parties." (citation omitted)).

Taking this course would be consistent with settled principles of administrative law. When an agency promulgates "valid and reasonable" regulations that "authoritatively construe" ambiguous statutory text, "it is . . . meaningless to talk about a separate cause of action to enforce the regulations apart from the statute." *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001). In this context, an action seeking to enforce the regulations by definition seeks to enforce the statute itself, because Congress left it up to the agency to develop a method of enforcing the statute's text. *See id.* Thus, Ohio is not seeking to enforce § 435.1010(b) because it thinks that it has a better chance of prevailing under that regulation than the Medicaid Act; it is seeking to enforce § 435.1010(b) because that regulation *is the governing law* implementing the inmate exclusion provision, and must be enforced unless the regulation is *ultra vires*. And to reiterate: no party to this litigation has argued that § 435.1010(b) is invalid or overbroad.

The majority's approach effectively permits the Secretary to ignore his own interpretive regulations when it suits him and resolve policy questions on an *ad hoc* basis by offering supplemental interpretations of the Medicaid Act. This cannot be correct. As the majority acknowledges, the Secretary's statutory interpretations are supposed to "have the force of law." Maj. Op. at 5 (quoting *Pharm. Research & Mfrs. of Am. v. Thompson*, 362 F.3d 817, 822 (D.C. Cir. 2004)). This means that when "an agency promulgates regulations, it is bound by those regulations, and it may not attempt to subvert the rulemaking process through interpretation unsupported by the regulation's language." *Ohio Cast Prods., Inc. v. Occupational Safety & Health Review Comm'n*, 246 F.3d 791, 794 (6th Cir. 2001); *Fluor Constructors, Inc. v. Occupational Safety & Health Review Comm'n*, 861 F.2d 936, 940 (6th Cir. 1988). In other words, when an agency promulgates interpretive regulations, those regulations serve as a *constraint* on the agency's later interpretive authority, and do not permit the agency to

selectively ignore its prior interpretations just because they later prove inconvenient.**2**  After all, regulations could hardly be said to carry the force of law if they bind only the public, and not the agency that administers them.  *Cf. Dismas Charities v. U.S. Dep't of Justice*, 401 F.3d 666, 681 (6th Cir. 2005) ("An interpretive regulation is binding on an agency . . . by virtue of the binding nature of the interpreted statute." (emphasis omitted)).

The majority's willingness to permit the Secretary to ground his denial of Ohio's Medicaid funding request in the text of the inmate exclusion provision, without reference to § 435.1010(b), thus creates a host of problems for members of the public trying to make sense of the federal government's voluminous regulations.  The public must follow the regulations, or be subject to potential penalties and other adverse action.  But the public cannot be equally sure that the federal government will consider itself bound by the interpretive framework set forth in its regulations.  Under the majority's theory, if the government determines that an application of its regulations would be inconvenient in a given context, the government can simply ignore them and ground its decision in a supplemental interpretation of its authorizing statute, confident that this Court will not only approve its end-run around its own regulations, but grant *Chevron* deference to its contradictory supplemental interpretation.  Federal agencies already enjoy near-conclusive deference in interpreting their own regulations.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).  They should not be free to altogether ignore those regulations.  Rules that "have the force of law" should carry more heft than the majority has assigned them today.

Accordingly, this dispute should be cabined to the narrower question of whether juvenile pretrial detainees are persons "living in a public institution for a temporary period pending other arrangements appropriate to [their] needs" within the meaning of § 435.1010(b).  Because this question involves assessing whether the Secretary permissibly interpreted his own regulations, and not whether he appropriately construed the inmate exclusion provision, the *Chevron* framework should not apply.  *See, e.g., Cole v. U.S. Atty. Gen.*, 712 F.3d 517, 531 (11th Cir.

---

**2**Rather, if an agency wishes to depart from an interpretation it has taken in prior published regulations, it may do so by employing the same notice-and-comment rulemaking procedure it used to promulgate the regulations in the first place, subject to the constraints imposed by the Administrative Procedure Act.  *See S. Forest Watch, Inc. v. Jewell*, 817 F.3d 965, 976 (6th Cir. 2016); *Nat'l Cable & Telecommc'ns Ass'n v. F.C.C.*, 567 F.3d 659, 667 (D.C. Cir. 2009).

2013) ("*Chevron* deference applies only to an 'agency's construction of the statute which it administers.'" (quoting *Chevron*, 467 U.S. at 842)); *Alkabsh v. United States*, 733 F. Supp. 2d 929, 934 (W.D. Tenn. 2010) (Donald, J.) ("*Chevron* applies only when an agency adopts a construction of a statute that it administers.").

**B.** *Auer* **Deference**

The majority alternatively justifies its holding by granting the Secretary's interpretation of § 435.1010(b) conclusive deference under *Auer v. Robbins*, 519 U.S. 452 (1997). This too was error.

In *Auer*, the Supreme Court held that an agency's interpretation of its own regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Id.* at 461 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). But this doctrine is not without exceptions. First, an agency's interpretation of its regulation is not entitled to deference when the regulation is unambiguous. *See, e.g.*, *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous . . . . To defer to [an] agency's position [where the text is clear] would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation."); *Duncan v. Muzyn*, 833 F.3d 567, 581–82 (6th Cir. 2016). Second, agencies are not entitled to *Auer* deference when the regulation merely restates statutory text. *Gonzales v. Oregon*, 546 U.S. 243, 256–57 (2006). Third, "deference is likewise unwarranted when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (quoting *Auer*, 519 U.S. at 462). As the Supreme Court has recently explained:

> This might occur when the agency's interpretation conflicts with a prior interpretation, see, *e.g., Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994), or when it appears that the interpretation is nothing more than a "convenient litigating position," *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 213 (1988), or a "'*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack," *Auer*, *supra*, at 462 (quoting *Bowen*, *supra*, at 212; alteration in original).

*Id.* at 2166–67.

I would decline to grant the Secretary's position *Auer* deference under the third exception,[3] because the Secretary's arguments during this litigation prove that his interpretation of § 435.1010(b) "is nothing more than a 'convenient litigating position.'" *Id.* (quoting *Bowen*, 488 U.S. at 213). In his briefing before us, the Secretary argues that the critical ingredient in determining whether a person is an inmate under § 435.1010(b) is whether that person is voluntarily residing in a public institution. As an example of someone who would not be considered an inmate, the Secretary argued that "a child in the State's custody who is temporarily placed in a public institution until a foster family home can be arranged[] . . . is not considered an inmate" under § 435.1010(b). (Respondent's Br. at 17.)

However, as Ohio correctly argues, the hypothetical child in the Secretary's example is not "voluntarily" residing in a public institution; because the child is in the State's custody, she would not be free to leave the public institution at her own volition. More broadly, because un-emancipated minors are *always* in the custody of their parents, their guardians, or the State, it is difficult to imagine how a child could ever be "voluntarily" residing by themselves in a public institution. The Secretary's interpretation of the regulation is thus internally inconsistent—he is willing to provide federal Medicaid funds for some children who are involuntarily in state custody (children who have been removed from their homes pending foster placement), but not others (juvenile pretrial detainees). This internal inconsistency counsels strongly against giving the Secretary's interpretation *Auer* deference, because it demonstrates that the Secretary lacks a consistent and reasoned position as to which persons are subject to the inmate exclusion provision. *See, e.g.*, *Barboza v. Cal. Ass'n of Prof'l Firefighters*, 799 F.3d 1257, 1268 (9th Cir. 2015) (holding that agency's "internally inconsistent" interpretations lacked "the 'hallmarks of thorough consideration'" and declining to afford either *Auer* or *Skidmore* deference (citation omitted)); *Int'l Alliance of Theatrical & Stage Emps. v. N.L.R.B.*, 334 F.3d 27, 34 (D.C. Cir. 2003) (declining to provide *Chevron* deference to agency's internally inconsistent interpretation); *Air Line Pilot's Ass'n v. F.A.A.*, 3 F.3d 449, 453 (D.C. Cir. 1993) (declining to give *Chevron* deference to agency interpretation that was "internally inconsistent and therefore unreasonable

---

[3]Section 435.1010(b) is ambiguous enough to require interpretation because "it is capable of being understood by reasonably well-informed persons in two or more senses." *Qwest Corp. v. Colo. Pub. Util. Comm'n*, 656 F.3d 1093, 1099 (10th Cir. 2011) (quoting *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1161 (10th Cir. 2001)); *Sec'y of Labor v. Beverly Healthcare-Hillview*, 541 F.3d 193, 198 (3d Cir. 2008); *see also* Maj. Op. at 10.

and impermissible"); *Trevino-Casares v. U.S. Parole Comm'n*, 992 F.2d 1068, 1073 (10th Cir. 1993) (same); *Sacramento Regional Cty. Sanitation Dist. v. Reilly*, 905 F.2d 1262, 1271 n.18 (9th Cir. 1990) (same).

The majority glosses over the inconsistency in the Secretary's position by pointing out that the Secretary has no "statutory duty to promulgate regulations that, either by default rule or by speculation, address every conceivable question in the process of determining equitable reimbursement" to the states, *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 96 (1995), and by arguing that "[c]hildren in state custody for foster care purposes are excluded from the definition of "inmate[s] not because their stay is deemed voluntary, but because they do not reside in 'public institutions.'" Maj. Op. at 13 (footnote omitted). Neither of these arguments are convincing. The majority's first point is a straw man; Ohio has never argued that the Secretary was required to promulgate separate regulations addressing the inmate status of children and adults. Rather, Ohio argues that juvenile pretrial detainees are not inmates under the text and logic of § 435.1010(b). And the majority's second point is flatly contradicted by the Secretary's own briefing. *See* Respondent's Br. at 17 ("An example [of a non-inmate] is a child in the State's custody who is temporarily placed *in a public institution* until a foster family home can be arranged[.]" (emphasis added)).

The majority further argues that the Secretary's voluntariness interpretation should receive *Auer* deference because CMS made reference to this interpretation in a 1997 memorandum, supposedly demonstrating that the interpretation was not contrived solely for this litigation. Maj. Op. at 13–14. However, the majority's argument ignores the central problem with the Secretary's interpretation: the Secretary has admitted *in this litigation* that he will not always consider the voluntariness of a person's stay in a public institution in determining whether she is an "inmate." Specifically, the Secretary acknowledges that a child involuntarily in state custody pending foster placement is not an inmate of a public institution. *See* Respondent's Br. at 17 (citing Admin. R. at 84–85). The Secretary does not explain why, as a matter of law, voluntariness matters for juvenile pre-trial detainees, but does not matter for juveniles awaiting foster placement—likely because there is no good faith way to reconcile those positions if voluntariness is actually the key criterion in determining whether a juvenile is an

inmate of a public institution. It simply does not matter that CMS may have referenced this voluntariness requirement in a twenty-year-old memorandum; the Secretary's admissions in this litigation show that he will not consistently apply the voluntariness interpretation going forward, undermining any rationale for giving the interpretation *Auer* deference.

Finally, the majority asserts that the Secretary's voluntariness interpretation is implicitly supported by other language in § 435.1010. Maj. Op. at 11–12. The Secretary never made this argument in his briefing, and thus the majority runs afoul of the Supreme Court's admonition that we "may not supply a reasoned basis for the agency's action that the agency itself has not given[.]" *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974). Our task is to assess whether *deference* to the Secretary's position is warranted; this necessarily places the focus of our inquiry on the reasoning advanced by the Secretary, and not whatever after-the-fact arguments we may be able to come up with. *See S.E.C. v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The ground upon which an administrative order must be judged are those upon which the record discloses that its action was based[.]"). And the Secretary's briefing makes clear that its voluntariness requirement was not grounded in the Medicaid Act or the text of § 435.1010(b), but rather in its own past interpretations of this provision. *See, e.g.*, Respondent's Br. at 14, 16.

Accordingly, I would decline to grant administrative deference of any sort to the Secretary's self-serving, internally inconsistent interpretation of § 435.1010. We should not give the Secretary's interpretation the force of law when it is clear that the Secretary does not intend to consistently apply that interpretation in all matters before his agency.

## II.    Interpreting § 435.1010

Because I believe that the Secretary's interpretation of § 435.1010(b) is not entitled to *Chevron* or *Auer* deference, I would interpret the regulation *de novo*. *See, e.g.*, *Trevino-Casares*, 992 F.2d at 1073 (observing, after declining to afford *Chevron* deference, "we consider it proper, indeed our duty, to follow our own independent interpretation of the statutes that govern the controversy before us"); *see also Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002) (reviewing statutes *de novo* after determining that *Chevron* deference was inappropriate).

As the majority explains, § 435.1010(b)'s text is ambiguous. Maj. Op. at 10. When a regulation is ambiguous, we look to the underlying statute's legislative history, the regulation's policy implications, and the regulation's preamble in determining how best to interpret it. *See In re Koenig Sporting Goods, Inc.*, 203 F.3d 986, 988–89 (6th Cir. 2000) ("When a statute is ambiguous, we look to its purpose and may consider the statute's policy implications in determining what Congress intended."); *City of Las Vegas v. F.A.A.*, 570 F.3d 1109, 1117 (9th Cir. 2009) ("When a regulation is ambiguous, we consult the preamble of the final rule as evidence of the context or intent of the agency promulgating the regulations."); *see also Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 738–39 (6th Cir. 1999).

The legislative history for 42 U.S.C. § 1396d does not disclose the policy reasons behind the inmate exclusion provision, and merely notes without discussion that a "State plan may not include any individual who is an inmate of a public institution, except as a patient in a medical institution." *See* S. Rep. 89-404, 1965 U.S.C.C.A.N. 1943, 2022 (June 30, 1965). However, in 1985, the Health Care Financing Administration, CMS' predecessor agency, stated that the "intent of [the inmate exclusion] provision is to ensure that Medicaid funds are not used to finance care which traditionally has been the responsibility of State and local governments." Medicaid Program; Federal Financial Participation for Inmates in Public Institutions and Individuals in an Institution for Mental Disease or Tuberculosis, 50 Fed. Reg. 13196-01, 13196 (Apr. 3, 1985).

Ohio argues that providing Medicaid funds for juvenile pretrial detainees would comport with this policy, because under Ohio law, the juvenile's parents, and not the state, typically pay for the juvenile's care while in custody. *See* Ohio. Rev. Code § 2151.36 ("[W]hen a child has been committed as provided by this chapter . . . the juvenile court shall issue an order . . . requiring that the parent, guardian, or person charged with the child's support pay for the care, support, maintenance, and education of the child."); *Matter of Mundy*, No. CA97-10-027, 1998 WL 60502, at *1 (Ohio Ct. App. Jan. 26, 1998) ("When a child is in the temporary custody of an agency, the juvenile court may examine a parent's income, order the parent to pay for certain expenses involved in the child's commitment, including medical expenses, enter judgment, and

enforce the same by execution."); *In re Rosser Children*, No. 16911, 1995 WL 353720, at *4 (Ohio Ct. App. June 14, 1995) (same).

Ohio's position is also supported by the only case to have examined the issue presented in this appeal, *Brown v. County Commissioners of Carroll County*, 658 A.2d 255, 262–63 (Md. 1995). In *Brown*, a Maryland state pretrial detainee sought dental care during the first month of his incarceration, and was later billed by his jailers for the cost of the care. *Id.* at 291–92. The detainee argued that that he should not be liable for the dental payments, because under Maryland's Medicaid program, the state health department was required to pay for all medical care incurred by "inmate[s] of a public institution . . . eligible for federally funded Medicaid benefits" in the first month of incarceration. *Id.* at 294. Maryland law tied the definition of the term "inmate of a public institution" to the federal definition adopted in 1978 by 42 C.F.R. § 435.1009, which is the same definition that exists today in 42 C.F.R. § 435.1010. *Id.* The pretrial detainee argued that he was not an "inmate of a public institution" because he was "in a public institution for a temporary period pending other arrangements appropriate to his needs." *Id.* at 295. Relying on a 1990 opinion by then-Attorney General Dick Thornburgh, the State argued that pretrial detainees are not eligible for federal Medicaid benefits. *Id.*

The Maryland Supreme Court disagreed with the State and the Attorney General, holding that pretrial detainees are eligible for federal Medicaid benefits, and thus the plaintiff in that case was eligible for benefits under the identical provisions in Maryland's Medicaid program. As the court explained:

> We do not believe that the Attorney General's and the County's interpretations of federal law as excluding medical assistance coverage for pretrial detainees follows a common sense approach to the language of the applicable statutes. First, the language of the federal regulation does not appear to clearly exclude pretrial detainees from coverage. The County, relying on the Attorney General's advisory opinion, argues first that the federal Medicaid regulations, by prohibiting coverage for "inmates of public institutions," exclude coverage for pretrial detainees and that because § 15–113 of the Health–General Article follows the federal definition, it too excludes pretrial detainees. We note that in his advisory opinion, the Attorney General provides no federal authority to support his contention that 42 C.F.R. § 435.1009, which authorizes coverage for an inmate who is "in a public institution for a temporary period pending other arrangements appropriate to his needs" is not applicable to pretrial detainees. *See* 75 Op. Att'y

Gen. at 1103. The Attorney General states only that, under Maryland law, there is nothing "inappropriate" about detaining those who cannot make bail. We find this argument unpersuasive. The language of 42 C.F.R. § 435.1009 does not require that an inmate's temporary stay in a public institution be inappropriate; it requires only that the stay is temporary pending other appropriate arrangements. In the instant case, Brown was in jail because he was not able to post bond. He was therefore incarcerated for a temporary period until he was either able to post bond or until the disposition of the criminal charges against him. The disposition of the criminal charges would determine which of two arrangements would be appropriate to his needs. He would either need to be punished by a specific sentence of incarceration or need to be released because incarceration is not necessary or he is not guilty of the criminal charges. Thus, Brown appears to clearly fall within 42 C.F.R. § 435.1009(b)'s exclusion and is "in a public institution for a temporary period pending other arrangements appropriate to his needs."

We have found no authority to support the Attorney General's contention that Medicaid coverage for an inmate "in a public institution for a temporary period pending other arrangements appropriate to his needs" is not intended to be applicable to pretrial detainees. *We find it unlikely that the federal regulation would intend that those who are indigent and eligible for Medicaid would lose those benefits simply because they are unable to post bail pending the disposition of the criminal charges against them.*

*Id.* at 300–02 (emphasis added; footnote omitted).

Against this backdrop, I would hold that juvenile pre-trial detainees are eligible for federal Medicaid funds under § 435.1010(b) for two reasons.

First, this result best comports with the regulation's plain language. As Ohio argues, juvenile pretrial detainees are, in a literal sense, persons living "in a public institution for a temporary period pending other arrangements appropriate to [their] needs." 42 C.F.R. § 435.1010(b). Pretrial detention facilities are certainly public institutions, because they are administered by the state. Moreover, under Ohio law, "[o]ne of the overriding purposes of [the] juvenile justice system is the rehabilitation of offenders." *State v. Bloomer*, 909 N.E.2d 1254, 1266 (Ohio 2009); *see also* Ohio Rev. Code § 2151.01 (stating that the purpose of the juvenile justice system is to "provide for the care, protection, and mental and physical development of children subject to Chapter 2151 of the Revised Code, whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's

welfare or in the interests of public safety."). "Since its origin, the juvenile justice system has emphasized individual assessment, the best interest of the child, treatment, and rehabilitation, with a goal of reintegrating juveniles back into society." *State v. Hanning*, 728 N.E.2d 1059, 1061 (Ohio 2000). Accordingly, juvenile pretrial detainees are temporarily in custody pending other arrangements appropriate to their needs—once their hearing date comes up, Ohio's juvenile justice system will determine how best to rehabilitate the affected juveniles.

Second, denying federal Medicaid benefits to juvenile pretrial detainees would not accord with the purpose of § 435.1010(b). As CMS' predecessor agency explained, the purpose of the inmate exclusion provision was to prevent the federal government from paying for care traditionally assumed by the states. 50 Fed. Reg. at 13196. As Ohio accurately points out, however, the state does not traditionally pay for a juvenile's care during pretrial detention. Rather, those costs are typically born by the juvenile's parents. Ohio. Rev. Code § 2151.36. Accordingly, denying federal benefits to juvenile pretrial detainees would not advance the regulation's admitted purpose.

Moreover, I find the Maryland Supreme Court's reasoning particularly compelling in this context. If CMS' interpretation of § 435.1010(b) is correct, children eligible for Medicaid would lose their benefits during their pretrial detention period regardless of whether they are ultimately found guilty of a crime. Because Ohio generally requires the child's parents to pay for the child's care, losing federal Medicaid benefits would be a particularly severe blow for the parents of juvenile pretrial detainees; they will be required to pay the full cost of their children's medical care during detention even though the children are otherwise eligible for Medicaid. One study has estimated the health care costs for persons incarcerated in Ohio at up to $5,755 per year. *See* The Pew Charitable Trusts, *State Prison Health Care Spending: An Examination* 24 (2014), http://www.pewtrusts.org/~/media/assets/2014/07/stateprisonhealthcarespendingreport.pdf. The blow visited by these health care costs will fall predominantly on families taking advantage of the federal "Healthy Start" program, which provides Medicaid funds for uninsured children in families with a total income of up to 206% of the federal poverty level.[4]

---

[4]As of January 26, 2017, 206% of the federal poverty level for a family of four is $50,676. *See* Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, *U.S. Federal*

*See* Ohio Department of Medicaid, *Programs for Children, Families, and Pregnant Women*, http://medicaid.ohio.gov/FOROHIOANS/Programs/ChildrenFamiliesandWomen.aspx (last visited July 7, 2017). The harsh result reached by the majority would thus seem to cut against the very purpose of the Medicaid program, which is to ease the burden of medical expenses on children and the needy. *See Schweiker*, 457 U.S. at 571 ("The Medicaid program was established . . . 'for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons.'" (citation omitted)). In the absence of any compelling textual or policy reasons to reach such a result, the plain language interpretation of the regulation should control.

### III.    Conclusion

The language and purpose § 435.1010(b) make clear that juvenile pretrial detainees are not inmates of a public institution, and are thus eligible for federal Medicaid funds. The Secretary's contrary interpretation should not be afforded administrative deference because it is internally inconsistent, signaling that the Secretary will not apply a considered and consistent rationale in determining which persons are subject to the Medicaid Act's inmate exclusion provision. Furthermore, the Secretary's position is contrary to the Medcaid Act's remedial purpose of easing the burden of medical expenses for needy children and families. I would therefore grant the petition for review, and require the Secretary to grant Ohio's Medicaid plan amendment.

---

*Poverty Guidelines Used to Determine Financial Eligibility for Certain Federal Programs* (Jan. 26, 2017), https://aspe.hhs.gov/poverty-guidelines.